**MILWAUKEE BRANCH OF the N.A.A.C.P.; Felmers Chaney; Vincent Knox and Barbara White, Plaintiffs,**

**Ramon Arellano Valdez and The Federation for Civic Action, Inc., Plaintiffs–Intervenors,**

v.

**Governor Tommy THOMPSON; Senate President Brian D. Rude; Senate Majority Leader Michael G. Ellis; Senate Minority Leader Robert Jauch; Assembly Speaker Walter J. Kunicki; Assembly Majority Leader David M. Travis; Assembly Minority Leader David T. Prosser, Jr.; Milwaukee County Board of Election Commissioners; Commissioner Molly Koranda; Commissioner Webster Harris, Jr.; Commissioner Tillie Bichanich; City of Milwaukee Board of Elections Commissioners; Commissioner Rosemarie McDowell; and Commissioner Jean Novshek, Defendants,**

**Wisconsin Association of Trial Judges; Patrick T. Sheedy and Frederick A. Henderson, Defendants–Intervenors.**

No. 94–C–1245.

United States District Court, E.D. Wisconsin.

Aug. 1, 1996.

See also, 929 F.Supp. 1150.

Richard Saks, Perry, Lerner & Quindel, Milwaukee, WI, Dennis Courtland Hayes, Willie Abrams, NAACP–Special Contribution Fund, Baltimore, MD, Todd A. Cox, Brenda J. Wright, Lawyers Committee for Civil Rights Under Law, Washington, DC, for Plaintiffs.

James E. Doyle, Jr., Peter C. Anderson, Kathleen M. Falk, Office of Attorney General, Wisconsin Dept. of Justice, Madison, WI, for Defendants Governor Tommy Thompson, Senate President Brian D. Rude, Senate Majority Leader Michael G. Ellis, Senate Minority Leader Robert Jauch, Assembly Speaker Walter J. Kunicki, Assembly Majority Leader David M. Travis, Assembly Minority Leader David T. Prosser, Jr.

Thomas L. Shriner, Jr., Foley & Lardner, Milwaukee, WI, for Defendant–Intervenors.

### DECISION and ORDER

MYRON L. GORDON, District Judge.

On November 10, 1994, the plaintiffs filed this action seeking declaratory and injunctive relief. The plaintiffs asserted claims under § 2 of the Voting Rights Act of 1965, ["VRA"], as amended, 42 U.S.C. § 1973, and the Fourteenth and Fifteenth Amendments to the United States Constitution regarding the statutory provisions of the state of Wisconsin and the procedures followed for the election of state judges in Milwaukee county. In their complaint, the plaintiffs alleged that the current at-large method for electing state circuit and appellate judges in Milwaukee county violates the VRA and the Fourteenth and Fifteenth Amendments with respect to black voters within the county. The plaintiffs charge that the current at-large judicial electoral technique impermissibly dilutes the voting strength of black voters in Milwaukee county.

On December 2, 1994, the plaintiffs-intervenors filed a motion to intervene, along with a proposed complaint in intervention, asserting claims on behalf of Hispanic voters which are almost identical to those made by the original plaintiffs. In their complaint, the plaintiffs-intervenors asserted that the current at-large scheme of elections for the state circuit court violates the VRA and the Fourteenth and Fifteenth Amendments with respect to Hispanic voters within Milwaukee county. However, the plaintiffs-intervenors do not challenge the system for electing judges to the state court of appeals in Milwaukee county.

On January 27, 1995, Judge John W. Reynolds granted the plaintiffs-intervenors' motion to intervene in this action, and, on April 26, 1995, he granted the defendants-intervenors' motion to intervene. An order was entered by Judge Reynolds on April 6, 1995, which bifurcated the trial into a liability stage and a remedy stage.

By decision and order of June 10, 1996, I granted the motion made by the defendants and defendants-intervenors for partial summary judgment as to the constitutional claims advanced by the plaintiffs and plaintiffs-intervenors. In the same ruling, I denied the motion made by both sets of defendants for partial summary judgment as to the plaintiffs-intervenors' claim under § 2 of the VRA.

A trial to the court was conducted on the issue of liability under § 2 of the VRA from

July 8, 1996, through July 16, 1996. Pursuant to the stipulation of the parties, which was approved by the court on July 8, 1996, the claims of the plaintiffs-intervenors were not at issue in this trial. This opinion constitutes the court's findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

The parties filed a comprehensive stipulation on July 8, 1996, setting forth 70 factual findings which the court may recognize under Rule 52, Federal Rules of Civil Procedure. In addition, on July 16, 1996, the parties filed an addendum to the stipulation which identifies one more factual finding. The stipulation and addendum to the stipulation are attached to this decision and order as appendix A. Factual findings made by the court which are not specifically identified in the stipulation or addendum to the stipulation are set forth in the body of this decision and order.

## I. SECTION 2 OF THE VOTING RIGHTS ACT

Section 2 of the VRA, as amended, prohibits states from imposing or applying any "standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). A violation of this provision is established where

> based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the electoral process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b) (emphasis in original).

■ At-large elections are not a *per se* violation of the VRA. *Thornburg v. Gingles,* 478 U.S. 30, 48, 106 S.Ct. 2752, 2765, 92 L.Ed.2d 25 (1986). Minority voters asserting a claim under the VRA must prove that the electoral structure "operates to minimize or cancel out their ability to elect their preferred candidates." *Id.*

■ To prevail on a challenge to an at-large system on behalf of a protected class of citizens, plaintiffs must meet the threshold requirements that the United States Supreme Court first identified in *Gingles.* Specifically, plaintiffs in vote dilution cases such as the one at hand must demonstrate that: (1) the group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. *Id.* at 50–51, 106 S.Ct. at 2765–67.

■ Proof of these three *Gingles* prerequisites creates an inference that members of the minority are harmed by the challenged electoral structure. *Uno v. Holyoke,* 72 F.3d 973, 980 (1st Cir.1995). However, "that inference is rebuttable." *Id.; Westwego Citizens for Better Government v. City of Westwego,* 946 F.2d 1109, 1116 (5th Cir.1991). The plaintiffs must show that, "under the totality of the circumstances," they do not possess the same opportunities to participate in the political process and to elect representatives of their choice enjoyed by other voters. *League of United Latin Amer. Citizens v. Clements,* 999 F.2d 831, 849 (5th Cir.1993) *cert. denied,* 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994) ["LULAC"]. In making this inquiry, courts are directed to analyze the factors first enunciated in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973), *aff'd sub nom East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), and later identified in the Senate Report accompanying the 1982 amendments to § 2 of the VRA. The non-exclusive list of factors to be addressed in a totality of the circumstances assessment include:

1. the extent of any history of official discrimination in the state or political sub-

division that touched upon the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; 2. the extent to which voting in the elections of the state or political subdivision is racially polarized; 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single-shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process; 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education and health, which hinder their ability to participate effectively in the political process; 6. whether political campaigns have been characterized by overt or subtle racial appeals; 7. the extent to which members of the minority group have been elected to public office in the jurisdiction. Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are: whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group [and] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. 417 at 28–29, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 206–07.

The Supreme Court has held that § 2 of the VRA applies to state judicial elections. *Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991); *Houston Lawyers' Ass'n v. Attorney General of Texas,* 501 U.S. 419, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991). However, the Supreme Court left open the issue of what a plaintiff would have to establish to obtain relief in vote dilution claims in the context of judicial elections. To date, the court of appeals for the seventh circuit has not had occasion to apply § 2 of the VRA to judicial elections. A number of other courts have done so, and those cases

are instructive in determining how, if at all, the *Gingles* and "totality of the circumstances" analyses differ in the context of judicial elections.

## II. GINGLES PRECONDITIONS

### A. Geographical Compactness

Under the first *Gingles* factor, the plaintiffs must show that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district. 478 U.S. at 50, 106 S.Ct. at 2766. In order to satisfy this standard, the plaintiffs must prove that there is a "solid and substantial" potential to elect a minority-preferred candidate in a single-member district. *McNeil v. Springfield Park District,* 851 F.2d 937, 944 (7th Cir.1988), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989). Thus, a minority group comprising less than a majority in a district would not necessarily have the potential to elect their candidates of choice. *Id.* The court of appeals for the seventh circuit has also made clear that a court must look only at minorities of voting age in determining whether a minority group is sufficiently large to constitute a majority in a single-member district because "those ineligible to vote have not experienced a dilution of their vote." *Id.* at 945.

"The first *Gingles* precondition ... dictates that the issue of remedy is part of the plaintiff's prima facie case in section 2 vote dilution cases." *Nipper v. Smith,* 39 F.3d 1494, 1530–31 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995). A district court is obligated to determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system. *Id.* at 1531.

Two recent decisions of the Supreme Court provide guidance in assessing whether a plaintiff's proposed remedy is permissible. In *Bush v. Vera,* —— U.S. ——, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), and *Shaw v. Hunt,* —— U.S. ——, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996), the Supreme Court struck down redistricting plans adopted pursuant to § 5 of the VRA from Texas and

North Carolina, respectively. Each of these redistricting plans involved bizarrely shaped majority-minority districts.

The Supreme Court held that these redistricting plans were unconstitutional under the Fourteenth Amendment because they departed dramatically from traditional redistricting principles such as geographic compactness and therefore, were not narrowly tailored to further a compelling governmental interest. In so holding, the Supreme Court rejected the contention that the redistricting plans were justified under § 2 of the VRA. The Court concluded that § 2 does not require a state to create, on predominantly racial lines, a district that is not "reasonably compact." *Bush*, —— U.S. at —— ——, 116 S.Ct. at 1960–62.

■ In my opinion, these two cases support the proposition that a proposed remedy under § 2 which departs from traditional redistricting principles solely because of a desire to create a majority black district is unconstitutional. Such a remedy would also be impermissible under the *Gingles* standard.

■ The defendants and defendants-intervenors acknowledge that a single-member district in which blacks would constitute a voting majority can be created for the state circuit court. However, they contend that the plaintiffs have failed to demonstrate that such a district can be created with respect to the state court of appeals.

As to the Wisconsin court of appeals, the plaintiffs propose that District I, which consists of Milwaukee county alone, be divided into four subdistricts with approximately equal population (roughly, 239,819). (Reports of Ian Millet, πs' Exs. 8 and 9). According to these two proposals, the black population in one of the four districts would form a majority of 62.5% or 63.7% black voting age population.

The defendants and defendants-intervenors contend that this remedy is inadequate because it would result in fewer voters per judge in District I than in the balance of the state. However, that is the case under the present system. Currently, the areas of the state outside Milwaukee county elect one judge for every 327,708 residents whereas Milwaukee county residents elect one court of appeals judge for every 239,819 residents. The plaintiffs' proposal does not significantly deviate from this current practice as the proposed subdistricts have populations of 237,133 (District 1), 241,915 (District 2), 240,504 (District 3), and 239,719 (District 4). (πs' Ex. 8, p. 4.) The additional assertion of the defendants and defendants-intervenors that subdistricting District I would require that all of the state's current sixteen court of appeals judges be elected from single-member districts with equal populations is unsubstantiated. Moreover, a review of the single-member districts proposed by the plaintiffs reveals that they are regularly shaped and geographically compact in compliance with traditional redistricting principles.

I find that the plaintiffs have demonstrated that under a single-member district scheme, Milwaukee county's black citizens would possess the potential to elect a state circuit court judge and a state court of appeals judge of their choice. Accordingly, the first *Gingles* test has been satisfied by the plaintiffs.

### B. Black Political Cohesion

■ The second *Gingles* precondition requires the plaintiffs to establish that the black voters in Milwaukee county are politically cohesive. "A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, ... and consequently, establishes minority bloc voting within the context of § 2." *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769.

This requirement is necessary because unless the minority group is politically cohesive, "it cannot be said that the selection of a [particular] electoral structure thwarts distinctive minority group interests." *Id.* at 51, 106 S.Ct. at 2766. The *Gingles* plurality opinion recognized that the race of the candidate is, in general, of less significance than the race of the voter when determining the existence of racial polarization. *Id.* at 67, 106 S.Ct. at 2774–75. The courts of appeals for the fifth and eleventh circuits have concluded that the evidence most probative of racially

polarized voting must be drawn from elections including both black and white candidates. *Nipper,* 39 F.3d at 1540; *LULAC,* 999 F.2d at 864; *Westwego Citizens for Better Government v. City of Westwego,* 872 F.2d 1201, 1208 n. 7 (5th Cir.1989).

Before applying the applicable law to the facts in this case, it should be noted that out of 46 circuit court judgeships in Milwaukee county the number of black judges currently on the circuit court bench is three: Russell Stamper, Maxine White and Stanley Miller. Judge Stamper was defeated by a white opponent in the general election of March 19, 1996, and will leave office on January 1, 1997. However, the recent appointment of a black circuit judge for Milwaukee county, M. Joseph Donald, will restore the statistical count to three. None of the four court of appeals judges in Appellate District I (Milwaukee county) is black.

The plaintiffs and defendants/defendants-intervenors both presented detailed statistical testimony on the degree of "racial polarization"; that is, black political cohesion and white bloc voting. Professor John Zipp, on behalf of the plaintiffs, and Professor Ronald Weber, on behalf of defendants/defendants-intervenors, evaluated past elections to determine whether white and black citizens differed in their voting patterns; the conclusions reached by the two professors were quite similar. However, there were two major differences in the data collected by them: (1) Professor Zipp did not estimate white and black support for candidates in judicial elections in which a black candidate did not run, while Professor Weber included such elections in his analysis; and (2) Professor Weber's analysis was limited to elections between 1981 and 1996, while Professor Zipp's analysis considered elections between 1972 and 1996.

■ According to the defendants and defendants-intervenors, the principal reason for excluding elections prior to 1981 is that such elections may be stale. I do not believe that "staleness" is an adequate reason completely to disregard this evidence. *See Nipper,* 39 F.3d at 1538 (the mere fact that the analyzed elections were somewhat dated does not reduce their probative value in § 2 vote dilu-

tion cases). Hence, in assessing the political cohesiveness of black voters in Milwaukee county, I will consider judicial elections which involved white and black candidates going back to 1972.

Based on Professor Zipp's estimates, there have been a total of 16 contested primary and general elections for the circuit court (or former county court) in which black candidates competed against white candidates for a seat on the court. (πs' Exs. 1 & 3.) In each of the 16 elections, black voters selected the black candidate as their preferred candidate in that they gave a majority or plurality of their support to the black candidate. Black support for black candidates ranged from 70.96% to 100% in the ten general elections and from 52.9% to 94%, with an average of 72.4%, in the six primary elections. (πs' Ex. 1, Table 4.) In all 16 of the elections studied by Professor Zipp, the black candidate was the preferred candidate of black voters.

In *Gingles,* the Supreme Court concluded that black support for black candidates which ranged from 71% to 92% in 11 out of 16 primary elections and from 87% to 96% in most general elections was overwhelming and demonstrated that blacks were politically cohesive even though black candidates were not the preferred candidate of black voters in some elections. *Gingles,* 478 U.S. at 59, 80–82, 106 S.Ct. at 2770–71, 2781–83.

■ The defendants and defendants-intervenors contend that evidence of low black voter turnout (measured as the percentage of total voters who turn out that are black) cuts against a finding of black political cohesiveness. The evidence at trial showed that only two of the past 15 election years involved black voter turnout of more than 10%: (1) 1988—12.9% in the primary election and 14.25% in the general election; and (2) 1996—12.8% in the general election. (▲s' Exs. 4, 8, and 18.) Even with one or more black candidates running for judicial office, black voters made up more than 10% of all voters who turned out to vote in only one election: the 1996 general election between incumbent Judge Stamper and challenger Robert Crawford in which the black turnout was 12.8%. Black voter turnout for the oth-

er six elections which involved a black candidate in this time period ranged between 3.3% and 8.8%. (▲s' Ex. 4.)

The defendants and defendants-intervenors maintain that low turnout reflects voter apathy and precludes a finding that particular candidates received substantial minority support. The plaintiffs acknowledge the weak turnout of black voters but argue that depressed rates of minority political participation do not rebut a finding of political cohesion.

In the instant case, I do not believe that low turnout among black voters sufficiently undercuts the plaintiffs' showing of black political cohesion. Admittedly, black turnout measured as the percentage of blacks who turnout among *all* voters is small. However, turnout measured in terms of the percentage of the black voting age population that turns out to vote is significantly higher in a number of elections. For example, 15.6% of the black voting age population turned out to vote in 1984 for black candidate Russell Stamper, 14.9% of the black voting age population turned out to vote in 1987 for black candidate Stanley Miller and 25% of the black voting age population turned out to vote in 1996 for incumbent Judge Stamper.

The uncontested testimony of Professor Peter Eisinger, called by the plaintiffs, demonstrated that significant racial disparity exists in Milwaukee county between blacks and whites in the areas of housing, employment, education and income. (πs' Exs. 4 & 5; Stipulation ¶¶ 52–67.) Hence, the defendants and defendants-intervenors have not proved that low voter turnout among black voters is due to voter apathy as opposed to the socioeconomic burdens endured by those voters.

In view of the above, I find that the plaintiffs' showing of black political cohesion is credible and has not been successfully rebutted by the defendants and defendants-intervenors.

### C. White Bloc Voting

The third *Gingles* prerequisite requires a determination whether the white majority votes as a bloc sufficiently to permit it "usually" to defeat the black candidate.

In *Gingles,* five of the justices of the Supreme Court ruled that § 2 liability does not arise from a mere showing that black and white voters *generally* give their votes to different candidates. Despite contrary expressions by a minority of the Court, it was the clear position of five justices that a broader inquiry into "special circumstances" must be made before a court can conclude that a white voting bloc exists and is "legally significant." The defendants cogently contend that nonracial causes of the voting preferences of the white majority should be considered in weighing the bloc-voting issue. *Gingles,* 478 U.S. at 83, 106 S.Ct. at 2783.

Justice O'Connor analyzed this issue in her concurring opinion by stating that:

> [e]vidence that a candidate preferred by the minority group in a particular election was rejected by white voters for reasons other than those which made that candidate the preferred choice of the minority group would seem clearly relevant in answering the question whether bloc voting by white voters will *consistently* defeat minority candidates. Such evidence would suggest that another candidate, equally preferred by the minority group, might be able to attract greater white support in future elections.

> I believe Congress also intended that explanations of the reasons why white voters rejected minority candidates would be probative of the likelihood that candidates elected without decisive minority support would be willing to take the minority's interests into account. In a community that is polarized along racial lines, racial hostility may bar these and other indirect avenues of political influence to a much greater extent than in a community where racial animosity is absent although the interests of racial groups diverge.... The overall vote dilution inquiry neither requires nor permits an arbitrary rule against consideration of *all* evidence concerning voting preferences other than statistical evidence of racial voting patterns.

*Id.* at 100–01, 106 S.Ct. at 2792 (emphasis added).

The principle that courts should undertake the additional inquiry into the reasons for, or

causes of, electoral losses pointed to by the plaintiffs was announced and applied by the Supreme Court in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).

██ The parties differ in their opinion as to which elections should be analyzed. The plaintiffs insist that only contested elections are relevant to the issue of racially polarized voting. The defendants and defendants-intervenors argue that the unique, low-profile nature of judicial elections make the interrelationship between uncontested elections and incumbency pertinent. In Wisconsin, judicial elections are non-partisan in the sense that the candidates do not run on party tickets.

In *Gingles,* the Supreme Court recognized incumbency as one of the "special circumstances" that could explain a deviation from a pattern of racially polarized voting such that uncontested elections involving an incumbent should be excluded from a court's consideration. 478 U.S. at 57, 106 S.Ct. at 2769–70. *Gingles,* of course, involved a § 2 claim in the context of *legislative* elections. The unexciting nature (usually, at least) of judicial elections suggests that the effects of incumbency tend to be even more significant in judicial races than in legislative campaigns. As discussed below, the evidence in this case shows that most judicial incumbents, including black incumbents, run for reelection without opposition. Since it is clear that incumbency frequently plays a determining role in judicial elections, I find that the impact of incumbency must be considered in the vote dilution inquiry. *Nipper,* 39 F.3d at 1535–36 (effects of incumbency should be considered in analyzing the value of statistics concerning the polarized voting inquiry and when making the ultimate determination of § 2 liability under the totality of the circumstances).

Out of the 16 contested judicial elections which involved a black candidate since 1972, the plaintiffs' analyst opined that white voters twice gave a majority or near majority of their vote to the black candidate. He concluded that Russell Stamper received 49.8% of the white vote in the election of April 3, 1984, and that Clarence Parrish received 62.6% of the white vote in the election of

April 7, 1981. In the remaining 14 elections, white support for the black candidate ranged from 9% to 34.5% in primary elections and from 22.7% to 44.5% in general elections.

Overall, average white support for black candidates in the six primary elections was 23.68%. (πs' Ex. 1, Table 4; πs' Ex. 3, Table 1 and p. 5.) Each of the six primaries had at least three candidates and one, in February 1989, had seven. (▲s' Ex. 17.) Moreover, in these six primaries, white support for the white candidates ranged from 4.6% to 50%. In five of these six primaries, the black candidate advanced to the general election. Thus, irrespective of the level of white support, it cannot be said that white bloc voting "usually" defeated the minority preferred candidate in these primary elections.

The average white support for black candidates in the 10 general elections was 40.25%. (πs' Ex. 1, Table 4; πs' Ex. 3, Table 1 and p. 5.) Out of these 10 contested general elections, the black preferred candidate won twice: in 1984, when Russell Stamper received 49.8% of the white vote and, in 1981, when Clarence Parrish received 62.6% of the white vote.

The plaintiffs suggest that this statistical evidence alone establishes the existence of white bloc voting because it is comparable to that found in *Gingles* where white support for the black candidates ranged from 8% to 50% in primary elections and from 28% to 46% in the general elections in the districts where a § 2 violation was affirmed. 478 U.S. at 80–82, 106 S.Ct. at 2781–83. However, our inquiry does not begin and end with statistics. The Supreme Court recognized that there was no benchmark for "legally significant" white block voting. *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769 ("legally significant" white bloc voting will vary from district to district.)

Uncontested elections involving incumbent black judges are also relevant to the issue of white bloc voting in the context of judicial elections. If a white majority voting bloc is able "usually" to defeat a black candidate, then one might expect to see, with some degree of frequency, challenges by white candidates against black incumbents, and, where

a challenge was mounted, the black candidate losing. This pattern is not present in the instant case.

In the past 25 years, five black incumbent state circuit court or county judges were challenged by white candidates; of these five incumbents, three lost their bid for re-election. However, two of these losses occurred before 1980. Since 1980, black incumbents have received opposition from a white candidate on only three occasions. Of these three instances, the black incumbent lost in one: Judge Stamper was defeated in 1996 by a white challenger, Robert Crawford. In this same time period, six black incumbent circuit or county judges went unchallenged. (▲s' Exs. 4 & 17.) These election results are summarized in the table attached as appendix B to this decision and order.

In the last ten years, there have been five challenges to full-term incumbent state circuit court judges and three with respect to state court of appeals judges. Four of the challenged incumbent circuit court judges were white, and one, Judge Stamper, was black. The incumbent lost or withdrew in three of the five circuit court races. In 1987, Judge Gorenstein withdrew when challenged by two candidates: one white and one black. In 1986, Judge Seraphim lost to a white challenger, and in 1996, Judge Stamper lost to a white challenger. Two of the full-term white incumbent state court of appeals judges—Judges Wedemeyer and M.T. Sullivan—lost in their court of appeals races to white challengers; the full-term white incumbent, Judge Moser, withdrew when challenged by a white candidate. These election results are identified in exhibit B to the stipulation which is attached as appendix A to this decision and order.

In my opinion, the infrequency with which black incumbent judges have actually been challenged undercuts the statistical evidence of white bloc voting in contested general elections over the past 25 years. The specific facts relating to the eight contested general elections in the circuit and county courts analyzed by the plaintiffs' witness in which black candidates lost to white opponents further highlights the inadequacy of proof that the candidates preferred by black voters lost "on account of race." 42 U.S.C. § 1973(a). A review of these eight elections demonstrates that in at least six, the divergent voting patterns among white minority voters is better explained by nonracial factors such as name recognition, campaign expenditures or the particular vulnerability of a given candidate.

In 1979, Clarence Parrish, a black attorney, was defeated by Ralph Adam Fine, a white attorney and well-known legal affairs reporter for a local television station. Subsequently, Clarence Parrish, who had been appointed to the bench by Governor Dreyfus, defeated a white challenger in 1981. In the 1981 race, he enjoyed white support of 62.6%. This significant level of white support suggests that his earlier defeats in 1973 and 1979 were not motivated by racial animus.

Stanley Miller, who is black, was defeated in 1987 by John Franke, a prominent Assistant United States Attorney who had gained publicity when he successfully prosecuted several members of a so-called organized crime family. By the time Mr. Miller announced his candidacy, Mr. Franke had already locked up virtually all of the major endorsements including those of the Governor, the Mayor of Milwaukee and several prominent black leaders. Mr. Franke also out-spent Mr. Miller during the campaign.

In 1989, Sheila Parrish, who is black, was defeated by Louise Tesmer, a white longtime member of the Wisconsin Assembly. Ms. Tesmer had a significant fundraising edge over Ms. Parrish. Louis Butler, who is black, lost his 1989 challenge to a white *incumbent* judge, Dominic Amato, who had obtained a large number of major endorsements and enjoyed a substantial edge in fundraising.

Most recently, just a few months ago, Judge Stamper, a black incumbent circuit judge, lost to a white challenger, Robert Crawford. The election campaign was unusually bitter. Judge Stamper did not respond publicly to Mr. Crawford's public accusations that his opponent was guilty of domestic abuse, had committed violations of judicial ethics and had aggressively advocated racial quotas in the election of judges.

In sum, I find that the plaintiffs have failed to meet their burden of establishing the existence of legally significant white bloc voting. The frequency with which judicial incumbents, including black incumbents, go unchallenged and the nonracial causes of the electoral losses often sustained by black candidates demonstrate that bloc voting by white voters will not *consistently* defeat minority candidates. *Gingles,* 478 U.S. at 100–01, 106 S.Ct. at 2792–93 (O'Connor, J., concurring).

Even if the minority's view on the law regarding racial bloc voting were controlling and even if all three of the *Gingles* prerequisites had been met, I do not believe (as I point out in the following paragraphs) that the important "totality of the circumstances" test supports a finding that black voters in Milwaukee county are denied the same opportunities to participate in the political process and to elect representatives of their choice enjoyed by other voters. 42 U.S.C. § 1973(b).

### III. TOTALITY OF THE CIRCUMSTANCES

In assessing the totality of the circumstances, the nature of a judicial election must be kept in mind. Unlike legislators, judges are not "representatives" of the voting public. Trial and appellate court judges are not elected to be responsive to their voters nor are they expected to advance the agenda of any particular interest group. Indeed, such conduct would constitute a violation of the ethical oath which judges in Wisconsin swear to uphold. Wis.Stat. § 757.02.

As a result of the special characteristics of judicial elections, a number of factors, in addition to those identified in the Senate Report, have been considered by courts when analyzing the totality of the circumstances. Two additional factors that have been assessed are: (1) the state's interest in maintaining an electoral system for judges that incorporates a link between a trial judge's jurisdiction and the areas of residency of his or her voters, *Houston Lawyer's Ass'n,* 501 U.S. at 427, 111 S.Ct. at 2381; *Southern Christian Leadership Conference of Alabama v. Sessions,* 56 F.3d 1281, 1294 (11th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996) ["SCLC"]; *Nipper,* 39 F.3d at 1535; *LULAC,* 999 F.2d at 868; and (2) the number of minority candidates eligible to serve on the bench, *SCLC,* 56 F.3d at 1296; *LULAC,* 999 F.2d at 865–66.

### A. State's Interest in Maintaining the At–Large Election of Judges

The Supreme Court expressly noted the legitimacy of a state's interest in having its trial judges elected from geographical districts that are co-extensive with the court's jurisdiction. *Houston Lawyer's Ass'n,* 501 U.S. at 426, 111 S.Ct. at 2380–81. While rejecting this interest as creating a categorical exclusion from § 2 coverage, the Court recognized that a state's interest in having its judge's elected by all voters within a court's jurisdictional boundaries might preclude a remedy involving the redrawing of boundaries or subdividing districts, or even a finding that vote dilution has occurred under the totality of the circumstances. *Id.*

The defendants and defendants-intervenors argue that even if the plaintiffs were able to satisfy each of the three *Gingles* preconditions, any inference of vote dilution is outweighed by the strong interest Wisconsin has in maintaining the current at-large system of electing trial and appellate court judges. The defendants and defendants-intervenors insist that the current system best balances the state's compelling interest in ensuring that judges are electorally "accountable" or "responsible" to every resident of the jurisdiction in which they primarily exercise jurisdiction. According to the defendants and defendants-intervenors, this system simultaneously maximizes judicial independence by ensuring that the pool of voters responsible for electing each judge is sufficiently broad to minimize the risk that distinct factions will be able unduly to influence sitting judges or those seeking judicial office in the exercise of their judicial function.

The state's interest in linking jurisdictional and electoral bases has been recognized by a number of federal appellate courts as "substantial." *SCLC,* 56 F.3d at 1294; *Cousin v.*

*McWherter,* 46 F.3d 568, 577 (6th Cir.1995); *LULAC,* 999 F.2d at 872. I agree. Irrespective of the race of individual litigants, trial and appellate judges in Milwaukee county make rulings that affect all county residents. Wisconsin, therefore, has insisted that the state's trial and appellate judges answer to all county voters at the ballot box.

The plaintiffs raise two arguments challenging the legitimacy of Wisconsin's interest in linkage. The plaintiffs contend that the use of visiting judges and the fact that non-residents come before Milwaukee county judges illustrate that Wisconsin does not consistently apply the policy of linking jurisdictional and electoral territories. Both of these arguments lack merit.

In my opinion, the occasional use of a visiting judge when a trial or appellate judge is ill or vacationing does not amount to an abandonment of the interests behind linkage. In fact, as recognized by the court of appeals for the fifth circuit, "insofar as linkage involves the appearance of judicial fairness and independence, visiting judges are not inconsistent with its purposes." *LULAC,* 999 F.2d at 874.

The plaintiffs' contention that the linkage interest is illusory because trial and appellate judges in Milwaukee county often adjudicate matters involving litigants who are not residents of the county also warrants scant attention. The fact is, trial and appellate judges in Milwaukee county make decisions that impact primarily upon residents within their jurisdiction.

In addition to challenging the legitimacy of the state's interest in linkage, the plaintiffs assert that the linkage interest deserves little weight because means are available to accommodate the linkage interest while simultaneously remedying the dilutive effects of the at-large electoral system. First, the plaintiffs propose two types of subdistricting remedies which incorporate at-large, county-wide, approval either immediately following an election by a particular subdistrict or midway through the term of the judge elected by the subdistrict. The plaintiffs also point to the possible use of limited voting or cumulative voting.

In their complaint and throughout trial the plaintiffs have consistently maintained that Wisconsin's at-large electoral system violates § 2 of the VRA. Nevertheless, all of the remedies identified by the plaintiffs would utilize at-large elections at least at some point in the original electoral or in the subsequent retention process. Hence, I find it difficult to accept the plaintiffs' assertion that such schemes are "remedies" for the current voting process objected to by the plaintiffs.

I am not convinced that the remedial programs pointed to by the plaintiffs detract from the weight to be afforded the state's interest in linkage. Wisconsin adopted its judicial election agenda about 150 years ago; surely it was not designed to minimize the election opportunities of blacks. The state of Wisconsin has a solid, long-standing interest in the at-large election of state judges.

In sum, I find that Wisconsin's interest in maintaining a link between jurisdictional and electoral bases is substantial. This does not mean that such interest alone always defeats § 2 liability. However, I do not believe such an interest can be overcome by marginal evidence of vote dilution. *LULAC,* 999 F.2d at 876 (more than marginal evidence of vote dilution is required to outweigh state's interest in linkage); *Bradley v. Work,* 916 F.Supp. 1446, 1473 (S.D.Ind.1996). Had I determined that the evidence presented by the plaintiffs satisfied all of the *Gingles* preconditions, it would not have been adequate to outweigh the state's valid and legal interest in linkage.

### B. Other Factors Relevant to Totality of Circumstances

The "totality of circumstances" test is a major factor in determining whether black voters in Milwaukee county have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 42 U.S.C. § 1973(b). I will address ten of the remaining factors which are germane to that test.

#### 1. Pool of Eligible Candidates

A functional and realistic view of the process for selecting state judges in Milwaukee

county must include an examination of the available pool of minority candidates. In this case, the plaintiffs have consistently pointed to the small number of minority circuit and court of appeals judges in Milwaukee county as proof that the opportunity for black voters in Milwaukee county is infringed by the existing at-large electoral system. However, those voters may only vote for eligible candidates. Only lawyers with at least five years of practice experience in Wisconsin are eligible to serve on the circuit or appellate benches. **Wis. Const.**, art. VII § 24(1).

Of the attorneys eligible to run for a circuit or appellate court judge in Milwaukee county, 2.9% are black. Currently, black judges in Milwaukee county comprise over 6.5% of the circuit court judges in Milwaukee county; three of 46 of the circuit court judges in Milwaukee County are black. As noted previously, Judge Stamper's departure from the bench, in January 1997, will not alter this percentage because M. Joseph Donald, who is black, has recently been appointed as a circuit court judge for Milwaukee county. Thus, while the number of black circuit judges in Milwaukee county at first appears to be small, it is, in fact, greater than the number predicted from black representation among eligible attorneys in Milwaukee county.

Given that the percentage of "eligible" black attorneys in Milwaukee county is only 2.9%, and there are only four court of appeals seats in District I (Milwaukee county), the likelihood is not great that even one of these judges would be black. I conclude that the current racial composition of the circuit and appellate court judges in Milwaukee county is consistent with the racial composition of the judicial candidate pools. As aptly noted by the court of appeals for the fifth circuit, "[t]he absence of eligible candidates goes along way in explaining the absence of minority judges." *LULAC,* 999 F.2d at 866.

### 2. *History of Official Discrimination*

A factor identified in the Senate Report is whether there is a pattern of any official discrimination that adversely affects the rights of minorities to register, vote or otherwise participate in the democratic process.

There is no evidence in the record to indicate that such a pattern exists in either Wisconsin or Milwaukee county. Wisconsin has never imposed a poll tax, a literacy test or any other mechanism that might diminish the ability of members of a racial minority group to vote. In fact, as I noted in my decision and order of June 10, 1996, Wisconsin has a very liberal voting access program; Wisconsin citizens are permitted to register and vote at the polling station on election day with only proof of residency required.

### 3. *Racially Polarized Voting*

Another factor identified in the Senate Report is the extent to which voting is racially polarized. I have already determined that the plaintiffs have not met their burden of proof to demonstrate the existence of white bloc voting. Because that *Gingles* precondition directly relates to the existence of racially polarized voting, I do not believe that this factor can be said to support the plaintiffs' § 2 vote dilution claim.

### 4. *Use of Voting Practices That May Enhance the Opportunity for Discrimination*

The plaintiffs attempt to invoke this factor by contending that Milwaukee county's boundaries for the circuit court and court of appeals are unusually large. I find nothing unusual about the county's boundaries. Circuit courts and counties are coterminous in all but six of Wisconsin's counties. Of the 72 counties in the state, there are only two counties which are geographically smaller than Milwaukee county.

As to the court of appeals, the population in District I gives each voter in Milwaukee county a greater say in the election of their appellate judges than voters in the other three appellate districts.

The plaintiffs also suggest that the lack of a subdistrict residency requirement hinders minority access to the political process since all candidates reside outside the minority neighborhoods. I find this argument somewhat disingenuous insofar as none of the plaintiffs' own proposed remedial schemes includes a residency requirement.

### 5. *Access to Minority Slating Process*

The plaintiffs concede that this factor is irrelevant in the instant case because no candidate slating process is employed in Wisconsin.

### 6. *Extent to Which Members of the Minority Group Bear the Effects of Discrimination*

A further factor identified in the Senate Report is the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health which may hinder their ability to participate in the political process. I have already concluded that the record contains evidence illustrating the existence of a significant disparity in Milwaukee county between blacks and whites in the areas of housing, employment, education and income. However, the plaintiffs have not adequately shown that these socioeconomic differences are attributable to past discrimination in Milwaukee county or in the state of Wisconsin.

Further, the evidence also shows that black participation is actually high in partisan and fall elections; this refutes the claim that black voters are politically hindered due to their lower socioeconomic status. (▲s' Exs. 125 & 126.)

### 7. *Overt or Subtle Racial Appeals*

In the Senate Report, a court is instructed to consider, under the totality of the circumstances, whether campaigns have been characterized by overt or subtle racial appeals. While the plaintiffs insist that this factor supports the inference of vote dilution, they are able to point to only one judicial election which appears to have involved racial appeals: the 1996 general election between Judge Stamper and Robert Crawford.

Assuming that the Stamper/Crawford election did, in fact, involve hostile racial conduct, one election in the past 25 years is hardly enough to prove a pattern.

### 8. *Minority Electoral Success in Public Offices*

Courts are also advised to weigh, under the totality of the circumstances, the extent to which members of the minority group have been elected to public offices in the jurisdiction. Aside from Milwaukee county circuit court and court of appeals races, which have already been discussed in some detail in this decision, blacks have enjoyed meaningful electoral success in Milwaukee county and in the state of Wisconsin. Plaintiffs' professorial witness, Peter Eisinger, noted that "black Milwaukeeans enjoy representation on the city council and in the state Legislature." (πs' Ex. 4, p. 25.) Electoral results confirm this success. Vel Phillips, a black, was elected in 1978 as Secretary of State. Black candidate, Richard Artison, was elected Sheriff of Milwaukee county in 1984 and re-elected three times thereafter. State Representative Spencer Coggs, who is black, testified that he came from a family with a long history of political success in Milwaukee county and the state of Wisconsin.

### 9. *Responsiveness of Elected Officials to the Needs of the Minority Group*

An additional factor that in some cases is considered to have probative value in § 2 vote dilution cases is whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the minority group. The plaintiffs have not alleged, nor was any evidence presented at the trial, showing that judges in Milwaukee county fail to judge in a fair and impartial manner or that the judges impermissibly base their decisions on the race of the parties, witnesses or victims.

The plaintiffs' assert that because the executive committee of the First Administrative Judicial District, the policymaking arm of the state circuit court, has no black representative, it could be perceived as being unresponsive to the needs of the black community in Milwaukee county. This argument is totally speculative. More importantly, on August 1, 1996, Maxine White, a black circuit

court judge in Milwaukee county, became a member of the committee.

### 10. *The Policy Underlying the Electoral Process at Issue*

The final factor identified in the Senate Report as germane to the totality of circumstances inquiry is whether the policy underlying the state's interest in maintaining its electoral system is tenuous. My earlier conclusion that the state of Wisconsin has a substantial interest in maintaining its 150–year–old at-large system for electing judges necessarily constitutes a rejection of the arguments raised by the plaintiffs with respect to this last factor (which are the same as those advanced earlier in this decision).

## IV. CONCLUSION

The plaintiffs have failed to meet their burden of proof on the third *Gingles* precondition which requires proof of legally significant white bloc voting. The plaintiffs also have failed to qualify under § 2 of the VRA because, under the totality of the circumstances test, black voters in Milwaukee county do not have less opportunity than other voters to participate in the political process and to elect judges of their choice. The plaintiffs have not met the burden of proving that the present electoral structure for electing judges "minimize[s] or cancel[s] out" the plaintiffs' ability to elect their preferred candidates. *Gingles,* 478 U.S. at 48, 106 S.Ct. at 2765. Accordingly, the plaintiffs' claim under § 2 of the VRA will be dismissed, with prejudice.

Pursuant to the stipulation of the parties, the plaintiffs-intervenors agreed to "dismiss their complaint with prejudice" if the plaintiffs did not prevail on the merits. Because all of the plaintiffs' claims will be dismissed, the plaintiffs-intervenors are directed to serve and file a notice of voluntary dismissal, with prejudice, no later than Monday, August 12, 1996.

Under 42 U.S.C. § 1973*l*(e), a court "in its discretion, may allow the prevailing party a reasonable attorney's fee" in an action, such as this one, "to enforce the voting guarantees of the fourteenth or fifteenth amendments." Because all of the claims against the defendants and defendants-intervenors will be dismissed, with prejudice, the defendants and defendants-intervenors are prevailing parties and are entitled to an award of attorney's fees under 42 U.S.C. § 1973*l*(e). However, in my opinion, only the plaintiffs, not the plaintiffs-intervenors, should be ordered to pay the reasonable attorneys' fees incurred by the defendants and defendants-intervenors.

The defendants and defendants-intervenors will be directed to serve and file a joint statement of reasonable attorneys' fees no later than Friday, August 23, 1996. The plaintiffs may serve and file their objections, if any, no later than Friday, September 6, 1996.

### ORDER

Therefore, IT IS ORDERED that the plaintiffs' claim under § 2 of the VRA be and hereby is dismissed, with prejudice and with costs.

IT IS ALSO ORDERED that, pursuant to the stipulation of the parties, the plaintiffs-intervenors be and hereby are directed to serve and file a notice of voluntary dismissal, with prejudice, no later than Monday, August 12, 1996.

IT IS FURTHER ORDERED that the plaintiffs, Milwaukee Branch of the NAACP, Felmers Chaney, Vincent Knox and Barbara White, be and hereby are ordered to pay the attorneys' fees of the defendants and defendants-intervenors pursuant to 42 U.S.C. § 1973*l*(e).

IT IS FURTHER ORDERED that the defendants and defendants-intervenors be and hereby are directed to serve and file a joint statement of reasonable attorneys' fees no later than Friday, August 23, 1996. The plaintiffs may serve and file their objections, if any, no later than Friday, September 6, 1996.

APPENDIX A

IN THE UNITED STATES
DISTRICT COURT

FOR THE EASTERN DISTRICT
OF WISCONSIN

Milwaukee Branch of the N.A.A.C.P.;
Felmers Chaney; Vincent Knox and
Barbara White, Plaintiffs,

Ramon Arellano Valdez and The Federation
for Civic Action, Inc., Plaintiff–
Intervenors,

v.

Governor Tommy Thompson; Senate President Brian D. Rude; Senate Majority Leader Michael G. Ellis; Senate Minority Leader Robert Jauch; Assembly Speaker Walter J. Kunicki; Assembly Majority Leader David M. Travis; Assembly Minority Leader David T. Prosser, Jr.; Milwaukee County Board of Election Commissioners; Commissioner Molly Koranda; Commissioner Webster Harris, Jr.; Commissioner Tillie Bichanich; City of Milwaukee Board of Election Commissioners; Commissioner Rosemarie McDowell; and Commissioner Jean C. Novshek, Defendants,

Wisconsin Association of Trial Judges,
Patrick T. Sheedy and Frederick A.
Henderson, Defendant–Intervenors.

Civil Action No. 94–C–1245

**STIPULATION**

Plaintiffs, by their attorneys, Richard Saks, of Perry Lerner & Quindel, S.C., and Brenda Wright and Todd A. Cox, of the Lawyers' Committee for Civil Rights Under Law, and defendants, by their attorneys, James E. Doyle, Attorney General, Peter C. Anderson and Kathleen M. Falk, Assistant Attorneys General, and defendant-intervenors, by their attorneys, Thomas L. Shriner, Jr., Richard M. Esenberg and Michael J. Aprahamian, of Foley & Lardner, stipulate that the Court may find the following:

1. Plaintiffs are the Milwaukee Branch of the NAACP, an organization whose members include many registered black voters residing in the City and County of Milwaukee, and individual voters Felmers Chaney, Vincent Knox, and Barbara White, who are black citizens of the United States and registered voters residing in the City and County of Milwaukee.

2. Plaintiff-intervenors are Ramon Valdez and the Federation for Civic Action, Inc. Ramon Valdez is a Hispanic registered voter residing in the City and County of Milwaukee. Federation for Civic Action, Inc. is an association of Hispanic registered voters in Milwaukee County. The plaintiff-intervenors were granted leave to intervene on behalf of Hispanic citizens.

3. Defendants are government officials alleged to be involved in the organization and/or administration of the court system in Milwaukee County.

4. Defendant, Tommy Thompson, is the duly elected, qualified, and acting Governor of the State of Wisconsin. As such, the Governor is the chief executive officer of the State of Wisconsin charged with the duty of implementing and executing the laws of the State. Defendant, Tommy Thompson, is being sued in his official capacity.

5. At the time the complaint was filed, defendant, Brian D. Rude, was the duly elected, qualified, and acting President of the Wisconsin State Senate. The current holder of that office is Fred Risser.

6. At the time the complaint was filed, defendant, Michael G. Ellis, was the duly elected, qualified, and acting Majority Leader of the Wisconsin State Senate. The current holder of that office is Chuck Chvala.

7. At the time the complaint was filed, defendant, Robert Jauch, was the duly elected, qualified, and acting Minority leader of the Wisconsin State Senate. The current holder of that office is Michael G. Ellis.

8. At the time the complaint was filed, defendant, Walter J. Kunicki, was the duly elected, qualified, and acting Speaker of the Wisconsin State Assembly. The current holder of that office is David T. Prosser, Jr.

9. At the time the complaint was filed, defendant, David M. Travis, was the duly elected, qualified, and acting Majority Lead-

er of the Wisconsin State Assembly. The current holder of that office is Scott R. Jensen.

10. At the time the complaint was filed, defendant, David T. Prosser, Jr., was the duly elected, qualified, and acting Minority Leader of the Wisconsin State Assembly. The current holder of that office is Walter J. Kunicki.

11. Defendant, the Milwaukee County Board of Election Commissioners, is the responsible agency under § 7.21, Wis.Stats., for conducting judicial elections for Circuit Court in the First Judicial Administrative District and for appellate judges in Appellate District I. Defendants, Molly Koranda, Webster Harris, Jr., and Tillie Bichanich, are the members of the Board of Election Commissioners for the County of Milwaukee, and are being sued in their official capacities. Defendant, the City of Milwaukee Board of Election Commissioners, is alleged to be a responsible agency for conducting such elections. Defendants, Rosemarie McDowell and Jean C. Novshek, are the members of the Board of Election Commissioners for the City of Milwaukee, and are being sued in their official capacities. Pursuant to agreement of the parties, the Court granted the request of the city and county defendants to be excused from representing themselves in the lawsuit, and to turn their defense over to the State Attorney General's office. Order dated April 6, 1995, at 2 (per Judge Reynolds, U.S.D.J.)

12. The Milwaukee County Election Commission and the City of Milwaukee Election Commission perform purely ministerial functions with respect to the conduct of elections within their respective jurisdictions, including (in the case of the County Commission) elections of state judges. Neither has any powers or responsibilities with respect to the boundaries of trial court circuits, or the manner in which judges are elected to a branch within a circuit.

13. Defendant-intervenor, Wisconsin Association of Trial Judges ("WATJ"), is a voluntary association of present and former state trial judges, which has approximately 177 members. Its members include trial judges throughout the state, and its members are citizens, residents, and taxpayers of Wisconsin and the counties in which they reside. WATJ's members are also registered voters of Wisconsin and their respective counties. At least 33 of WATJ's members are sitting Milwaukee County circuit judges.

14. Defendant-intervenor, Patrick T. Sheedy, is a Milwaukee County Circuit Court Judge and is Chief Judge of the First Judicial Administrative District. He is also a citizen, resident, and taxpayer of, and lawyer and registered voter in both the State of Wisconsin and the County of Milwaukee. He has been permitted to intervene in his personal capacity.

15. Defendant-intervenor Frederick A. Henderson is a Rusk County Circuit Court Judge. He is a citizen, resident, and taxpayer of, and lawyer and registered voter in both the State of Wisconsin and the County of Rusk. He has been permitted to intervene in his personal capacity.

16. Chief Judge Sheedy and at least 32 other members of WATJ are sitting Milwaukee County Circuit Court Judges elected by the voters of Milwaukee County in at-large judicial elections pursuant to the election system established pursuant to Article VII, Sections 6, 7 & 9 of the Wisconsin Constitution, and §§ 753.01, 753.06, and 753.061 of the Wisconsin Statutes.

17. All judges of courts of record in Wisconsin must be attorneys who have been licensed to practice in the state for at least five years. *Wis. Const.*, art. VII, § 24(1).

18. Article VII, Sec. 6, of the Wisconsin Constitution provides: "The legislature shall prescribe the number of judicial circuits, making them as compact and convenient as practicable, and bounding them by county lines."

19. Article VII, Sec. 7, of the Wisconsin Constitution provides for the election of circuit court judges, stating: "For each circuit there shall be chosen by the qualified electors thereof one or more circuit judges as prescribed by law."

20. Article VII, Sec. 5(2) of the Wisconsin Constitution provides: "For each district of the appeals court there shall be chosen by the qualified electors thereof one or more appeals judges as prescribed by law, who shall sit as prescribed by law."

21. Circuit Court judges in Wisconsin are elected to a branch of the Circuit Court by an at-large vote of all the electors within the circuit. Judicial elections are nonpartisan and are held in the spring, separate from partisan elections (except that in presidential election years, the judicial general election is held at the same time as the Presidential Preference Primary). *Wis. Const.*, art. VII, § 9; Wis.Stat. § 8.11(3).

22. The circuit-wide election of judges in circuits whose boundaries are coincident with the boundaries of one of more counties dates to Wisconsin's admission to the Union in 1848. This system has been continuously maintained ever since.

23. All counties in the State of Wisconsin, including Milwaukee, constitute a single judicial circuit, with the exception of Buffalo and Pepin Counties, Florence and Forest Counties, and Menominee and Shawano Counties, wherein the two counties mentioned together constitute one judicial circuit. Wis.Stat. § 753.06. Milwaukee has constituted a single circuit since 1882. *See* 1882 Wis.Laws, ch. 55 (detaching Waukesha County from second judicial circuit leaving only Milwaukee County to comprise circuit). In addition, since 1978, when judicial administrative districts were created, Milwaukee County has been the only county in the First Judicial Administrative District and is the only county to comprise its own Judicial Administrative District.

24. The Circuit Court for Milwaukee County presently has 46 branches, with each branch consisting of one judgeship and constituting a circuit court with all the powers and jurisdiction possessed by other circuit courts, including those with only one branch and judge. Wis.Stat. §§ 753.06(1) and 753.061(1). Circuit judges are elected to individual branches.

25. From 1849 to 1978, there also existed a system of county courts within all Wisconsin counties, including Milwaukee County. 1849 Wis.Laws, Ch. 86; Wis.Stat. § 253.01 (1975).

26. Judges of the county courts were also elected on an at-large basis. 1849 Wis.Laws, Ch. 86, § 1; Wis.Stat. § 253.05 (1975).

27. In 1978, county courts wee abolished and sitting county judges were made judges of newly-created branches of the circuit court. Wis.Stat. § 753.07(1). The constitutional provisions governing the election of judges "by the qualified electors thereof" were not changed. *Wis. Const.*, art. VII, § 7.

28. Along with the abolition of county courts in 1978, amendments to the Constitution in 1977 also mandated, for the first time, an intermediate level appellate court, the Court of Appeals. *Wis. Const.*, art. VII, § 5. The new Court of Appeals was established by implementing legislation. 1977 Wis.Laws, Ch. 187.

29. While the Court of Appeals is a single court, the Constitution authorizes the Legislature to combine the judicial circuits of the state into one or more districts for the Court of Appeals. *Wis. Const.*, art. VII, § 5. Court of Appeals judges for each district are chosen by the qualified electors of the district voting on an at-large, district-wide basis.

30. The Legislature has divided the Court of Appeals into four districts coterminous with the boundaries of one or more counties. Wis. Stat. § 752.11. Milwaukee County, which is, by far, the most populous county in the state, is the only county which constitutes a single district and has since the creation of the Court of Appeals in 1978. Wis.Stat. § 752.11.

31. The court of appeals sits in panels of three judges, except in a limited class of cases that are decided by one judge. Wis. Stat. § 752.31. Although each district of the Court of Appeals considers cases in panels of three, the number of judges within each district is determined by state legislation. *Wis. Const.*, art. VII, § 5(2); Wis.Stat. § 752.03.

32. District I, consisting of Milwaukee County, currently has four judges. Wis.Stat.

§§ 752.13, 752.11. The rest of the state, outside of Milwaukee County elects twelve Court of Appeals judges, who serve on the Court's other three districts. District II, with chambers in Waukesha, has four judges, District III, with chambers in Wausau, has three judges. District IV, with chambers in Madison, has five judges. Secs. 752.15, 752.17, 752.19., Stats.

33. Circuit court and court of appeal judges are elected in non-partisan elections, and serve six-year terms. Terms of the various branches do not all expire in the same year. Candidates for the circuit court and court of appeals may reside anywhere in Milwaukee County.

34. For all judicial elections in Wisconsin, including the election of judges to the Milwaukee County Circuit Court and the Wisconsin Court of Appeals District I, if more than two candidates file for a particular seat, a primary election is held to narrow the field to the top two vote-getters. Wis.Stat. § 8.11(3). The top two vote-getters then run in the general election. If only two candidates file for a judicial seat, only a general election is held. Although the winner of the general election need only receive a plurality of votes cast and there have been a few judicial elections in Milwaukee County in which a write-in candidate received more than a handful of votes, there has been no election since 1972 in which the candidate winning the general election did not receive the majority of the votes cast.

35. Mid-term vacancies on either the circuit court or the Court of Appeals are filled by gubernatorial appointment. *Wis. Const.,* art. VII, § 9. The Governor's appointee must then stand for election to a full term at the next election. Wis.Stat. § 8.56(4)(f).

36. The Wisconsin Constitution does not place any limits on the Governor's discretion in filling such vacancies. The manner in which the Governor exercises this power of appointment varies from administration to administration, but generally involves the use of some type of commission, consisting of attorneys and non-attorneys, to screen applicants and make recommendations.

37. Currently, the Governor, by executive order, maintains an Advisory Council on Judicial Selection, including seven permanent members and additional members from each circuit or district to participate in filling vacancies within that circuit or district. In the event of a circuit court vacancy, notice is mailed to all attorneys within the circuit. In the event of an appellate court vacancy, notice is provided through an insert in the state bar newsletter, use of public media, and by mailings to county bar associations, judges, and clerks of court within the district. Applications are reviewed and, where necessary, the field is narrowed to 10. Following that process, interviews are conducted and the Council reports to the Governor, recommending at least three, but no more than five, persons to fill the vacancy. The executive order sets forth minimum standards for the evaluation of prospective appointees.

38. Since first taking office in January 1987, Governor Thompson has appointed 13 judges to the Milwaukee County Circuit Court. Exhibit A to this stipulation sets forth the identity of the applicants, the number of times each applied, their race, whether they have been recommended, and whether they have been appointed. Governor Thompson will be making another appointment before July 31, 1996, to fill Branch 3, left vacant by Patricia Curley's March 1996 election to the Court of Appeals. Four African Americans and nineteen whites applied for this position. One African American and two whites have been recommended for the Governor's consideration.

39. According to the 1980 Census, in 1980, Milwaukee County had a total population of 964,988, of which 709,906 were residents ages 18 and above. By 1980, Milwaukee County's black population had reached 149,435, or 15.5% of the county's total population. The number of black residents of voting age was 85,977, representing 12.11% of the county's voting age population.

40. According to the 1990 Census, the total population of Milwaukee County is 959,275. The total non-Hispanic white population is 698,864 (72.9 percent); the total non-Hispanic black population is 193,583 (20.2

percent); and the total Hispanic population is 44,671 (4.7 percent).

41. According to the 1990 Census, the total voting age population of Milwaukee County is 712,973. The total non-Hispanic white voting age population is 558,273 (78.3 percent); the total non-Hispanic black voting age population is 115,598 (16.2 percent); and the total Hispanic voting-age population is 25,644 (3.6 percent). African–Americans (both Hispanic and non-Hispanic) made up 16.34% of Milwaukee County's voting age population, or 116,499 out of a total voting age population of 712,973.

42. According to the 1990 Census, the total population of the City of Milwaukee is 628,088, of whom 189,408 (30.2 percent) are black. The total voting age population of the City of Milwaukee is 455,948, of whom 112,-542 (24.7 percent) are black (both Hispanic and non-Hispanic).

43. According to the 1990 Census, 98% of all blacks in Milwaukee County live in the City of Milwaukee, while 56% of all whites in Milwaukee County live in the City of Milwaukee. Eighty percent of Wisconsin's African–American population and 50% of the state's Hispanic population lives in Milwaukee County. Milwaukee County is home to 15.5% of the state's non-Hispanic, white population.

44. A summary of the results for elections to county court, circuit court and the Court of Appeals in Milwaukee County is set forth in Exh. B to this stipulation.

45. A complete report of the election results, including vote totals, for Milwaukee county in elections to the circuit court, county court, Court of Appeals, and Supreme Court are set forth in Defendants' Exhibit 85, and is incorporated herein. The parties will supplement this Stipulation by providing the Court a complete report of certain "exogenous elections" to be attached as Exhibit C to this Stipulation.

46. One of plaintiffs' experts, Mr. Ian Millett, prepared two reports describing potential subdistricts that could be drawn for the election of circuit and court of appeals judges in Milwaukee County. These reports are Plaintiffs' Exhibits 8 and 9. The parties stipulate that, if Mr. Millett were called as a witness at trial, he would testify to the facts and conclusions set forth in his reports, Plaintiffs' Exhibits 8 and 9. The parties do not object to the admission of those reports (including attachments) into evidence. Any party can identify during trial portions of Mr. Millett's deposition testimony to be entered into the record.

47. The Constitution of 1848, art. III, §, limited suffrage to white males 21 years old and above (along with certain adult males of Indian decent), but permitted the Legislature to extend the suffrage to others if the amendatory law was approved by the voters at a general election. The session of the Legislature in 1849 extended the vote to adult male "colored persons," 1849 Wis.Law, ch. 137, subject to such a vote. The voters approved the amendment in the general election in November 1849. *Gillespie v. Palmer,* 20 Wis. 544 (1866). In *Gillespie,* a black citizen sued a group of election inspectors in Milwaukee County who had refused to receive his vote because he was black. The Wisconsin Supreme Court held that the defendants had wrongfully denied plaintiff his right to vote because black suffrage became a law when the issue was submitted to the people in 1849, and a majority of the votes cast on the subject were in favor of black suffrage.

48. Wisconsin did not employ devices such as poll taxes or literacy tests to deprive black citizens of the right to vote, once the right to vote was established. Currently, Wisconsin permits same-day registration and voting, and imposes only a 10–day residency requirement. Wis.Stat. § 6.55.

49. Milwaukee County comprises about 241 square miles of land.

50. Of the 72 counties in the state, there are only two counties which are geographically smaller in size than Milwaukee County, and they are Ozaukee and Pepin Counties.

51. At no time in Wisconsin's history, nor that of Milwaukee county, has there been any candidate slating process for candidates for judicial office.

52. According to the 1980 Census, blacks in Milwaukee earned a median income of

$14,956, while whites in Milwaukee earned a median income of $17,069.

53. According to the 1990 Census, blacks in Milwaukee earned a median income of $15,64, while whites in Milwaukee earned a median income of $26,848.

54. According to the 1980 Census, the per capita income of whites in Milwaukee was $7,865, while the per capita income for blacks in Milwaukee was $4,707.

55. According to the 1990 Census, the per capita income of whites in Milwaukee was $13,909, while the per capita income for blacks in Milwaukee was $6,833.

56. According to the 1980 Census, 43,390 (29.9%) blacks in Milwaukee were in poverty while 37,018 (8.1%) whites in Milwaukee were in poverty.

57. According to the 1990 Census, 78,797 (41.9%) blacks in Milwaukee were in poverty, while 39,522 (10.8%) whites in Milwaukee were in poverty.

58. According to the 1980 Census, 66.3% of whites in Milwaukee had completed high school or better, while 52.6% of blacks in Milwaukee had completed high school or better.

59. According to the 1990 Census, 77.0% of whites in Milwaukee had completed high school or better, while 60.2% of blacks in Milwaukee had completed high school or better.

60. According to the 1980 Census, the unemployment rate for blacks in Milwaukee was 13.9%, while the unemployment rate for whites in Milwaukee as 5.2%.

61. According to the 1990 Census, the unemployment rate for blacks in Milwaukee was 18.6%, while the unemployment rate for whites in Milwaukee was 4.9%

62. According to the 1980 Census, 51.0% of whites in Milwaukee owned homes, while 33.8% of blacks in Milwaukee owned homes.

63. According to the 1990 Census, 51.7% of whites in Milwaukee owned homes, while 29.7% of blacks in Milwaukee owned homes.

64. According to the 1980 Census, 20.2% of white households in Milwaukee were without automobiles, while 39.6% of black households in Milwaukee were without automobiles.

65. According to the 1990 Census, 17.4% of white households in Milwaukee were without automobiles, while 42.7% of black households in Milwaukee were without automobiles.

66. According to the 1980 Census, 3.3% of white households in Milwaukee were without telephones, while 10.6% of black households in Milwaukee were without telephones.

67. According to the 1990 Census, 2.7% of white households in Milwaukee were without telephone, while 11.6% of black households in Milwaukee were without telephones.

68. There are two accredited law schools in the State of Wisconsin; they are the University of Wisconsin (U.W.) Law School in Madison and Marquette University Law School in Milwaukee. The Chairman of Admissions of U.W. Law School is Professor John Kidwell. The Assistant Dean of Admissions at the Marquette University Law School is Ms. Geraldine Clausen. If the Chairman and Assistant Dean of the two law schools were called as witnesses at trial, each of them would testify to the facts and conclusions set forth in paragraphs 69 and 70, below, for each of their law schools.

*University of Wisconsin Law School*

69. The admissions policy at the University of Wisconsin Law School has been generally the same for over the past 25 years and may be described as follows:

a. The U.W. Law School has an affirmative action admissions policy that employs academic and non-academic factors for the selection of student applicants. Non-academic factors include minority status and other factors, such as geographical diversity, experience in the workforce, etc.

b. It is the view of Professor John Kidwell, chairman of Admissions at the U.W. Law School, that it is not more difficult for minority students to get accepted into the U.W. Law School than white students over the past twenty-five years.

c. As a member of the law school faculty since 1972, and having spoken with former chairs of the admission committees, Professor Kidwell has been familiar with admissions policy for about 24 years. Professor Kidwell has served on the admissions committee for about the past five years; he is currently chair of the admissions committee and has been the chair for about the last three years.

d. Consideration of diversity factors permits admission of students, including minority students, with lower GPA and LSAT test scores than the average academic background of other students who are admitted.

e. The University of Wisconsin Law School makes efforts to recruit minority students, including attendance by the Dean of Admissions at college fairs to recruit minority applicants, recruiting applicants among students at historically black colleges, and connecting minority student applicants with enrolled minority students, by, for example, inviting at no cost minority applicants to the annual banquet held for minority students by the law school.

*Marquette University Law School*

70. The admissions policy at Marquette University Law School may be described as follows:

a. The current written admissions policy states that both quantitative and qualitative factors will be considered in the selection of law school applicants.

b. Some of the factors considered include: qualities that enhance the diversity of the student body; applicants from different cultural and experiential backgrounds; and applicants who are members of historically disadvantaged groups or groups that have been under represented in the legal profession.

c. The factors considered today for admission are generally consistent with the factors that have been utilized by Marquette University Law School for the past twenty-five years.

d. It is the view of Ms. Geraldine Clausen, Assistant Dean of Admissions at the Marquette University Law School, that it is not more difficult for minority students to get accepted into the Marquette University Law School than white students over the past twenty-five years.

e. Over the years, Marquette University Law School has employed an increasingly assertive posture to recruit minority applicants, including attending functions which minority students attend, contacting minority students at colleges, etc.

RICHARD SAKS
/s/ Richard Saks
Attorney for Plaintiffs

Perry, Lerner & Quindel, S.C.
823 North Cass Street
Milwaukee, WI 53202–3908

JAMES E. DOYLE
Attorney General
PETER C. ANDERSON
Assistant Attorney General
KATHLEEN M. FALK
Assistant Attorney General
/s/ Peter C. Anderson
Attorneys for State Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707–7857
(608) 266–9595
(608) 266–1350

THOMAS L. SHRINER, JR. (WBN 1015208)
RICHARD M. ESENBERG (WBN 1005622)
MICHAEL J. APRAHAMIAN (WBN 1020115)
/s/ Richard M. Esenberg
Attorneys for Defendant–Intervenors Wisconsin
Association of Trial Judges, Patrick T. Sheedy and
Frederick A. Henderson

FOLEY & LARDNER
Firstar Center
777 East Wisconsin Avenue
Milwaukee, WI 53202–5367

Direct Inquiries to:
(414) 297–5601 (TLS)
(414) 297–5517 (RME)
(414) 297–5516 (MJA)

## EXHIBIT A

### MASTER LIST OF APPLICANTS FOR JUDICIAL VACANCIES DURING GOVERNOR THOMPSON'S TERM

| Name | Black | Hispanic | White | Recommended | Appointed |
|---|---|---|---|---|---|
| Abrahamson, Sherman | | | X | | |
| Aiken, Jeffrey P. | | | X | | |
| Amato, Dominic | | | X | X | X |
| Baker, Richard J. (4) | | | X | | |
| Berg, Kenneth R. (5) | | | X | X(1) | |
| Blask, James F. (4) | | | X | | |
| Blumenfield, Charles F. | | | X | | |
| Bock, William F. | | | X | | |
| Bottoni, Thomas | | | X | | |
| Brash, William W., III(4) | | | X | | |
| Britton, Ronald P. | X | | | | |
| Bunde, Peter W. (2) | | | | X(2) | |
| Butler, Louis B., Jr. (4) | X | | | X(1) | |
| Cannon, Peter J. (3) | | | X | | |
| Carter, John J. (3) | | | X | | |
| Castro, Robert C. | | X | | | |
| Cimpl, Dennis R. (7) | | | X | | |
| Conen, Jeffrey | | | X | | |
| Cooper, Thomas R. (6) [1] | | | X | X | X |
| Crawford, Robert (2) | | | X | | |
| Derus, Margaret M. (2) | | | X | | |
| Dugan, Timothy (4) | | | X | X(2) | X |
| Dwyer, Michael J. (2) | | | X | | |
| Edhlund, Sandra A. | | | X | | |
| Emmerson, Milton G. (2) | X | | | | |
| Flanagan, Mel (3) | | | X | X(1) | X |
| Fraker, Donald R. | | | X | | |
| Frenn, Thomas L. | | | X | | |
| Gehrke, Harold D. (3) | | | X | | |
| Gimbel, Seymour (2) | | | X | | |
| Glamm, Steven H. (3) | | | X | | |
| Goldberger, Ronald S. | | | X | X | X |
| Gonring, Michael J. | | | X | X | |
| Gordon, Bonnie (3) | | | X | | |
| Grady, Lance S. | | | X | | |
| Greene, George W., Jr. (4) | | | X | X(2) | X |
| Grove, Patricia L. (2) | | | X | | |
| Hale, Christopher T. | | | X | | |
| Hansen, Susan A. (2) | | | X | | |
| Hart, Richard H. (2) | | | X | | |
| Hayes, John P. | | | X | | |
| Hayes, Thomas E. (4) | | | X | | |
| Held, Harvey | | | X | | |
| Hicks, Joan L. | X | | | | |
| Higgins, John P. | | | | | |
| Huntley, Ronald P. (2) | X | | | | |
| Johnson, Marcus T. (2) | X | | | | |
| Juech, Stephen B. | | | X | X | |
| Kaminski, G. Steven (2) | | | X | | |
| Klaus, Warren J. (2) | | | X | | |
| Klaver, Mary A. | | | X | | |
| Klimetz, Frederick F. | | | X | | |
| Klumb, Eric (2) | | | X | X(2) | |
| Kraemer, Robert E., Jr. (2) | | | | | |
| Konkol, Daniel Lee | | | X | | |
| Kremers, Jeffrey (6) | | | X | X(3) | X |
| Lamelas, Elsa C. (2) | | X | | X(2) | X |
| Lampiris, Ann R. (2) | | | X | | |
| Liska, Frank J., Jr. (2) | | | X | | |

| Name | Black | Hispanic | White | Recommended | Appointed |
|---|---|---|---|---|---|
| Machi, Anthony J. (7) | | | X | | |
| Malone, Calvin R. | X | | | | |
| Mann, Douglas F. (4) | | | X | | |
| Marohl, David W. | | | X | | |
| Matestic, Fred (6) | | | X | X(4) | |
| McBride, Dennis (2) | | | X | | |
| McElligott, F. Brian | | | X | | |
| McIlnay, Bruce A. | | | X | | |
| McKnight, Robert A. | | | | | |
| Mellencamp, Thomas D. | | | X | | |
| Michelstetter, Stanley (2) | | | | | |
| Miller, Stanley (3) | X | | | X(1) | X |
| Moroney, Dennis P. (3) | | | X | X(2) | X |
| Mountin, Mary J. | | | | | |
| Mukamal, Stuart S. (2) | | | X | | |
| Noonan, Daniel A. (5) | | | X | | |
| Parrish–Spence, Sheila M. (6) | X | | | | |
| Payne, Mary H. (5) | | | X | X(1) | |
| Phillips, William, Jr. (3) | X | | | | |
| Pikofsky, Seymour (7) | | | X | | |
| Poulos, Mary Ellen (3) | | | X | | |
| Puglisi, Carmello A. (2) | | | X | | |
| Robles, David | | X | | | |
| Roden, William J. (2) | | | X | | |
| Rogers, Mark J. | | | X | | |
| Rothstein, Stephanie G. (4) | | | X | | |
| Russell, Patrick (2) | | | X | | |
| Rustad, Janice M. | | | X | | |
| St. Clair, Fred (2) | X | | | | |
| St. Ores, Sheryl A. (5) | | | X | | |
| Sankovitz, Richard J. | | | X | X | |
| Savage, John P. (5) | | | X | X(1) | X |
| Schalig, Suzanne K. (2) | | | X | | |
| Schellinger, Jacqueline (2) | | | X | X(2) | X |
| Simpson, Douglas J. (3) | X | | | | |
| Spalatin, Mario S. (5) | | | X | | |
| Starck, Douglas H. | | | X | | |
| Tepper, Jerome A. (4) | | | X | | |
| Tesmer, Louise | | | X | | |
| Thornton, Rosemary (2) | | | X | | |
| Wedemeyer, Ted E. | | | X | X | X |
| Weigel, William J. | | | X | | |
| White, Carol Lynn (2) | | | X | | |
| White, Maxine (2) | X | | | X(2) | X |
| Witkowiak, Timothy M. | | | X | | |

1. John P. Savage withdrew after he was appointed but before he was sworn in; he was replaced by Thomas R. Cooper.

## EXHIBIT B
## MILWAUKEE COUNTY JUDICIAL ELECTIONS, 1972–96

| Year | Branch | Incumbent | Challengers |
|---|---|---|---|
| 1972 | Cir. 6 | Landry* | None |
| | Cir. 7 | Drechsler retired | J. Foley* |
| | Cir. 10 | Neelen* | None |
| | Cir. 18 | New | Seraphim* |
| | | | Grant |
| | Cty. 9 | Miech* | None |
| | Cty. 11 | Bowman# | Jennaro* |
| | | | Berger |
| | Cty. 13 | Phillips [1] (NA)# | Manian* |
| | | | Halloway |
| | | | Tilton |
| | | | Temple |

■■■■■■■■

■■■■■■

| Year | Branch | Incumbent | Challengers |
|------|--------|-----------|-------------|
| 1973 | Cir. 1 | Young retired | Ceci* |
| | Cir. 5 | Podell* | None |
| | Cir. 8 | O'Neill retired | Barron* |
| | | | Parrish [1]# |
| | | | Hayes |
| | Cir. 11 | Steffes retired | Seraphim* |
| | | | Landry |
| | Cir. 12 | Coffey* | None |
| | Cir. 17 | O'Connell* | None |
| | Cty. 1 | Shaughnessy* | None |
| | Cty. 4 | Kessler (NA)* | F. Miller# |
| | | | Nevers |
| | | | Crockett [1] |
| | | | Alexopoulos |
| | Cty. 5 | Jennings* | None |
| | Cty. 10 | McCormick* | None |
| 1974 | Cir. 2 | Burns (NA)* | None |
| | Cir. 3 | Decker* | None |
| | Cty. 6 | Gram (NA) | Gorenstein* |
| 1975 | Cir. 9 | R. Curley* | None |
| | Cir. 13 | Spracker retired | Manian* |
| | | | Beaudry |
| | Cir. 14 | L. Foley* | None |
| | Cir. 18 | Jackson [1] (NA)* | None |
| | Cir.19 | New | McCormick* |
| | Cty. 3 | Evans (NA)* | None |
| | Cty. 14 | New | Gram* |
| | | | Backus |
| 1976 | Cty. 2 | M.T. Sullivan* | None |
| | Cty. 10 | Gerlach (NA)* | None |
| 1977 | Cir. 4 | Cannon* | None |
| | Cir. 15 | Holz* | None |
| | Cir. 16 | Moser* | None |
| | Cty. 7 | Walstead retired | M.P. Sullivan* |
| | Cty. 8 | Steinmetz* | None |
| | Cty. 12 | Madden* | None |
| | Cty. 13 | Guolee (NA)* | Halloway# |
| | | | Blask |
| 1978 | CA(6 yr.) | New | Decker* |
| | CA(4 yr.) | New | Cannon* |
| | CA(2 yr.) | New | Moser* |
| | Cir. 6 | Landry* | None |
| | Cir. 7 | J. Foley* | None |
| | Cir. 10 | Neelen retired | Wedemeyer* |
| | Cty. 9 | Miech* | None |
| | Cty. 11 | Jennaro* | None |
| 1979 | 1 | Ceci* | None |
| | 3 | P. Curley (NA)* | Gramling# |
| | | | Wood |
| | 4 | Lampone (NA)* | Lowe# |
| | | | Eldridge |
| | 5 | Podell retired | Sheedy* |
| | 8 | Barron* | None |

| Year | Branch | Incumbent | Challengers |
|------|--------|-----------|-------------|
| | 16 | St. Clair [1] (NA)# | Gardner* |
| | | | Brooks |
| | 17 | O'Connell* | None |
| | 20 | Shaughnessy* | None |
| | 23 | Kessler* | None |
| | 24 | Jennings* | None |
| | 34 | New | Fine* |
| | | | C. Parrish [1]# |
| | | | Sosnay |
| | 35 | New | Randa* |
| | | | Lipscomb |
| | 36 | New | Callan* |
| | | | Backus |
| | | | Connors |
| | | | Halloway |
| | | | Machi |
| 1980 | CA | Moser* | Seraphim |
| | 2 | Burns* | None |
| | 25 | Gorenstein* | None |
| | 37 | New | Connors* |
| | | | Schneider# |
| | | | Halloway |
| | | | St. Clair |
| 1981 | 9 | R. Curley* | None |
| | 13 | Manian* | None |
| | 14 | L. Foley* | None |
| | 18 | Jackson [1] | None |
| | 19 | McCormick* | None |
| | 21 | C. Parrish [1] (NA)* | Gray |
| | 22 | Haese (NA)* | None |
| | 27 | Doherty (NA)* | None |
| | 33 | Gram* | None |
| 1982 | CA | Randa (NA) | Wedemeyer* |
| | 23 | Geske (NA)* | Knoll |
| | 35 | Wells (NA)* | None |
| 1983 | 1 | Schudson (NA)* | Blask |
| | 10 | Randa (NA)* | None |
| | 29 | Gerlach* | None |
| 1984 | CA | M.T. Sullivan* | None |
| | 9 | Stamper [1] (NA)* | Steinle |
| | 15 | Holz* | None |
| | 17 | Wasielewski (NA)* | None |
| | 26 | M.P. Sullivan* | None |
| | 31 | Madden* | None |
| | 32 | Guolee* | None |
| 1985 | 3 | P. Curley* | None |
| | 4 | Lampone* | None |
| | 6 | Landry* | None |
| | 7 | J. Foley* | None |
| | 12 | Skwierawski* | None |
| | 16 | Gardner* | None |
| | 28 | Miech* | None |
| | 30 | Crivello (NA)* | None |
| | 34 | Fine* | None |
| | 36 | Callan* | None |

| Year | Branch | Incumbent | Challengers |
|------|--------|-----------|-------------|
| **1986** | CA | Moser* | None |
| | 5 | Sheedy* | None |
| | 8 | Barron* | None |
| | 11 | Seraphim | Kessler* |
| | 14 | C. Foley (NA)* | None |
| | 20 | Shaughnessy* | None |
| | 24 | Jennings* | Zander |
| | 37 | Connors* | None |
| **1987** | 2 | Burns* | None |
| | 18 | McMahon (NA)* | None |
| | 19 | McCormick* | None |
| | 21 | C. Parrish [1]* | None |
| | 22 | Haese* | None |
| | 25 | Gorenstein withdrew | Franke* |
| | | | S. Miller [1] |
| | 27 | Doherty* | None |
| | 33 | Gram* | None |
| **1988** | CA | Wedemeyer | Fine* |
| | 13 | Manian* | None |
| | 23 | Geske* | None |
| | 35 | Wells* | None |
| | 38 | New | Wagner* |
| | | | Rohlich |
| | 39 | New | Malmstadt* |
| | | | Seraphim# |
| | | | Poulos |
| | | | Halloway |
| **1989** | 1 | Schudson* | None |
| | 10 | Randa* | None |
| | 11 | Amato (NA)* | Butler [1] |
| | 15 | Goldberger (NA)* | None |
| | 29 | Gerlach* | None |
| | 34 | Wedemeyer (NA)* | None |
| | 40 | New | Tesmer* |
| | | | S. Parrish [1]# |
| | | | Konkol |
| | | | Machi |
| | | | Blask |
| | | | Kaiser |
| | | | Crawford |
| **1990** | CA | M.T. Sullivan* | None |
| | 9 | Stamper [1]* | None |
| | 17 | Wasielewski* | None |
| | 26 | M.P. Sullivan* | None |
| | 31 | Madden* | None |
| | 32 | Guolee* | None |
| | 41 | New | DiMotto* |
| **1991** | 3 | P. Curley* | None |
| | 4 | Lampone* | None |
| | 6 | Landry* | None |
| | 7 | J. Foley* | None |
| | 12 | Skwierawski* | None |
| | 16 | Gardner* | None |
| | 28 | Miech* | None |

| Year | Branch | Incumbent | Challengers |
|------|--------|-----------|-------------|
| | 30 | Crivello* | None |
| | 36 | Callan* | None |
| | 42 | New | Hansher* |
| 1992 | CA | Moser withdrew | Schudson* |
| | CA(5 yr.) | New | Wedemeyer* |
| | 5 | Sheedy* | None |
| | 8 | Barron* | None |
| | 14 | C. Foley* | None |
| | 20 | Shaughnessy* | None |
| | 24 | Jennings retired | Kahn* |
| | | | Dugan |
| | 37 | Connors* | None |
| | 43 | New | Sykes* |
| | | | Halloway# |
| | | | McElligott |
| | 44 | New | Konkol* |
| | | | Moroney |
| | 45 | New | Donegan* |
| 1993 | 1 | White [1] (NA)* | None |
| | 2 | Burns* | None |
| | 10 | Dugan (NA)* | None |
| | 18 | McMahon* | None |
| | 19 | McCormick* | None |
| | 21 | S. Miller [1] (NA)* | None |
| | 22 | Haese* | Blask |
| | 25 | Franke* | None |
| | 27 | Doherty* | None |
| | 33 | Gram* | None |
| | 34 | Schellinger [2] (NA)* | None |
| | 36 | Kremers (NA)* | McNamara–McGraw |
| 1994 | CA | Fine* | None |
| | 4 | Flanagan (NA)* | None |
| | 6 | Greene (NA) | Brennan* |
| | 13 | Manian* | None |
| | 20 | Moroney (NA)* | None |
| | 23 | Lamelas [3] (NA)* | None |
| | 28 | Cooper (NA)* | None |
| | 35 | Wells* | None |
| | 38 | Wagner* | None |
| | 39 | Malmstadt* | None |
| | 46 | New | Gordon* |
| 1995 | 11 | Amato* | None |
| | 15 | Goldberger* | None |
| | 29 | Gerlach* | None |
| | 40 | Tesmer* | None |
| 1996 | CA | M.T. Sullivan | P. Curley* |
| | 9 | Stamper [1] | Crawford* |
| | 17 | Wasielewski* | None |
| | 26 | M.P. Sullivan* | None |
| | 31 | Madden retired | Noonan* |
| | 32 | Guolee* | None |
| | 41 | DiMotto* | None |

\* winner
\# survived primary

| (NA) | newly appointed judge |
| 1 | African–American |
| 2 | Native American |
| 3 | Hispanic |

## EXHIBIT C

### MILWAUKEE COUNTY EXOGENOUS ELECTIONS
### SUMMARY OF ELECTION RESULTS

| Date | Office/Election | Candidates | Vote |
|------|-----------------|------------|------|
| 3/19/96 | Milwaukee Mayor | Richard E. Artison (B) | 54,972 |
| | | John Norquist | 82,148 |
| 2/6/96 | Supreme Court Primary | Charles B. Schudson | 8,664 |
| | | Ralph Adam Fine | 24,358 |
| | | Lawrence C. Bugge | 8,741 |
| | | Stanley A. Miller (B) | 14,890 |
| | | Harold V. Froehlich | 2,001 |
| | | Ted E. Wedemeyer, Jr. | 20,987 |
| | | Patrick Crooks | 11,735 |
| 2/21/95 | Milw. School Board At Large Primary | Robert Harris Jr. (B) | 4,107 |
| | | John Gardner | 6,276 |
| | | Rose Daitsman | 6,433 |
| | | Robert Kurth | 4,859 |
| 11/8/94 | County Clerk | Larry Moore (B) | 13,380 |
| | | Rod Lanser | 183,378 |
| | | Jerry Broitzman | 18,627 |
| 11/8/94 | County Sheriff | R. Artison (B) | 203,198 |
| | | Edward Buck | 13,359 |
| | | Ardenne Bunde | 11,289 |
| 9/13/94 | County Sheriff Democratic Primary | R. Artison (B) | 21,286 |
| | | Ralph Hall | 3,936 |
| 11/3/92 | County Sheriff | R. Artison (B) | 328,207 |
| | | A. Bunde | 35,966 |
| 9/8/92 | 5th Congressional District Democratic Primary | Terrance Pitts (B) | 18,928 |
| | | Frederick Kessler | 15,729 |
| | | Marc Marotta | 13,411 |
| | | Tom Barrett | 34,301 |
| | | R. Blenski | 662 |
| | | Gerald Wilson | 483 |
| 2/18/92 | County Executive Primary | A. Polly Williams (B) | 22,061 |
| | | Paul Matthews | 21,380 |
| | | Thomas Ament | 45,765 |
| | | Joseph Czarnezki | 43,779 |
| | | James Wahner | 32,556 |
| 2/18/92 | Milwaukee Mayoral Primary | Michael I. McGee (B) | 7,028 |
| | | Willie Lovelace (B) | 1,266 |
| | | John Norquist | 49,180 |
| | | Gregory Gracz | 36,444 |
| | | Ira Robbins | 4,790 |
| | | David Hall | 978 |

| Date | Office/Election | Candidates | Vote |
|------|-----------------|------------|------|
| 4/2/91 | Milw. Municipal Judge Branch 2 | S. Miller (B)<br>H. Halloway | 22,799<br>17,282 |
| 2/19/91 | Milw. School Board at Large Primary | Texas Bufkin (B)<br>Bobby Lee Nichols (B)<br>Pamela Penn<br>Kathleen Hart<br>Stephen Thiel<br>Neil Bromberg<br>Michael Lisowski<br>David Lucey | 2,087<br>311<br>3,351<br>3,765<br>246<br>428<br>1,111<br>4,462 |
| 11/8/88 | Fifth Congressional District | Helen Barnhill (B)<br>Jim Moody | 78,307<br>140,518 |
| 9/13/88 | County Clerk Primary | Ben Johnson (B)<br>Alan Eisenberg<br>Thomas Zablocki<br>James Cupertino<br>Frank Kapusta<br>Edward Anhalt<br>Rod Lanser<br>Mark Borkowski<br>Dawn Sass | 14,983<br>14,919<br>29,333<br>26,199<br>5,096<br>2,302<br>32,151<br>13,420<br>10,638 |
| 4/5/88 | Democratic Presidential Primary | Jesse Jackson (B)<br>Paul Simon<br>Gary Hart<br>Al Gore<br>Bruce Babbitt<br>Michael Dukakis<br>Richard Gephart | 94,952<br>9,834<br>1,243<br>37,084<br>392<br>115,817<br>1,452 |
| 2/16/88 | Milw. Mayoral Primary | Lee Holloway (B)<br>Willie Lovelace (B)<br>Kevin Robinson (B)<br>Sandra Sherman (B)<br>John Norquist<br>Marty Schreiber<br>Donna Richards | 7,865<br>411<br>613<br>677<br>40,575<br>44,894<br>5,983 |
| 4/7/87 | Milw. School Board At Large | Gloria Mason (B)<br>Doris Stacy | 46,516<br>51,491 |
| 2/17/87 | Milw. School Board At Large Primary | G. Mason (B)<br>D. Stacy<br>Kenneth Kraucunas | 6,578<br>7,335<br>2,573 |
| 11/4/86 | County Sheriff | R. Artison (B)<br>Raymond Lorberter | 224,911<br>11,116 |
| 9/9/86 | County Sheriff Democratic Primary | R. Artison (B)<br>Rick Rizzardi<br>Wyatt Earp | 52,814<br>4,363<br>6,405 |
| 9/9/86 | U.S. Senate Democratic Primary | Gary George (B)<br>Ed Garvey<br>Matt Flynn<br>Roman Blenski | 10,577<br>26,131<br>29,648<br>2,098 |

| Date | Office/Election | Candidates | Vote |
|------|----------------|------------|------|
| 2/18/86 | Milw. Municipal Judge Branch 3 Primary | Orville Pitts (B) | 2,364 |
| | | Ronald Britton (B) | 1,851 |
| | | John Siefert | 5,108 |
| | | James Gramling | 4,155 |
| | | Emilio Lopez | 500 |
| | | William Weigel | 890 |
| | | Reynold Ritter | 3,478 |
| 11/6/84 | County Sheriff | R. Artison (B) | 316,345 |
| | | F. Kapusta | 101,429 |
| | | John Logan | 10,245 |
| 4/3/84 | Democratic Presidential Democratic Primary | J. Jackson (B) | 22,940 |
| | | Ernest Hollings | 600 |
| | | Alan Cranston | 1,266 |
| | | Walter Mondale | 69,812 |
| | | George McGovern | 2,543 |
| | | G. Hart | 56,010 |
| | | John Glenn | 1,547 |
| | | Rueben Askew | 131 |
| 2/15/83 | Milw. School Board Primary | Leon Todd (B) | 2,212 |
| | | D. Stacy | 10,287 |
| | | Gerald Farley | 3,464 |
| | | Anthony Busalacchi | 4,985 |
| | | James Koneazny | 2,725 |
| | | Lawrence O'Neil | 2,401 |
| 9/14/82 | Secretary of State Democratic Primary | V. Phillips (B) | 30,993 |
| | | Douglas LaFollette | 71,145 |
| | | Ada Deer | 54,862 |
| | | Lewis Mittness | 8,021 |
| 9/14/82 | 5th Congressional District Democratic Primary | O. Pitts (B) | 15,264 |
| | | R. Blenski | 1,409 |
| | | Jim Moody | 17,073 |
| | | Karen Lamb | 3,814 |
| | | Marty Aronson | 11,797 |
| | | Fred Kessler | 15,804 |
| | | Harout Sanasarian | 2,812 |
| | | Kevin O'Connor | 10,368 |
| | | Warren Braun | 13,320 |
| | | John Werner | 539 |
| 11/7/78 | Secretary of State | V. Phillips (B) | 160,137 |
| | | Frederic Seefeldt | 132,029 |
| | | George Meyers | 6,789 |
| 4/1/75 Black Candidates designated as (B) | Milw. Municipal Judge Branch 1 | S. Miller (B) | 12,945 |
| | | Ted Wedemeyer | 45,343 |

Black candidates denoted as (B).

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

Milwaukee Branch of the N.A.A.C.P.; Felmers Chaney; Vincent Knox and Barbara White, Plaintiffs,

Ramon Arellano Valdez and The Federation for Civic Action, Inc., Plaintiff–Intervenors,

v.

Governor Tommy Thompson; Senate President Brian D. Rude; Senate Majority Leader Michael G. Ellis; Senate Minority Leader Robert Jauch; Assembly Speaker Walter J. Kunicki; Assembly Majority Leader David M. Travis; Assembly Minority Leader David T. Prosser, Jr.; Milwaukee County Board of Election Commissioners; Commissioner Molly Koranda; Commissioner Webster Harris, Jr.; Commissioner Tillie Bichanich; City of Milwaukee Board of Election Commissioners; Commissioner Rosemarie McDowell; and Commissioner Jean C. Novshek, Defendants,

Wisconsin Association of Trial Judges, Patrick T. Sheedy and Frederick A. Henderson, Defendant–Intervenors.

Civil Action No. 94–C–1245

**ADDENDUM TO STIPULATION**

Plaintiffs, by their attorneys, Richard Saks, of Perry, Lerner & Quindel, and Brenda Wright, of the Lawyers' Committee for Civil Rights Under Law, and defendants, by their attorneys, James E. Doyle, Attorney General, Peter C. Anderson and Kathleen M. Falk, Assistant Attorneys General, and defendant-intervenors, by their attorneys, Thomas L. Shriner, Jr., Richard M. Esenberg, and Michael J. Aprahamian of Foley & Lardner, stipulate that the Court may find the following:

67(a). Between 1980–1990, the African–American population in Milwaukee county increased by 41,820. For 1985–1990, in-migration into Milwaukee County of all residents was 121,955, of which 18,666 were African–American. Of these African–American in-migrants, 52% were below the poverty line, and 42.2% were high school graduates. Of the 90,319 white in-migrants, 11.97% were below the poverty line and 39.4% were college graduates.

RICHARD SAKS

/s/ Richard Saks
Attorneys for Plaintiffs

Perry, Lerner & Quindel, S.C.
823 North Cass Street
Milwaukee, WI 53202–3908

JAMES E. DOYLE
Attorney General

PETER C. ANDERSON
KATHLEEN M. FALK
Assistant Attorneys General

/s/ Kathleen M. Falk
Attorneys for State Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707–7857
(608) 266–9595

THOMAS L. SHRINER, JR. (WBN 1015208)
RICHARD M. ESENBERG (WBN 1005622)
MICHAEL J. APRAHAMIAN (WBN 1020115)

/s/ Michael J. Aprahamian
Attorneys for Defendant–Intervenors Wisconsin
Association of Trial Judges, Patrick T. Sheedy and
Frederick A. Henderson

FOLEY & LARDNER
Firstar Center
777 East Wisconsin Avenue
Milwaukee, WI 53202–5367

Direct Inquiries to:

(414) 297–5601 (TLS)
(414) 297–5517 (RME)
(414) 297–5516 (MJA)

## APPENDIX B