Dear Mr. Levy:
We are in receipt of your request for an Attorney General's opinion regarding various methods of electing district judges, other than the two (2) methods of "at-large" elections and "subdistrict" elections which are now being used in our state. You seek an opinion on the legality (constitutional and statutory) of the following described procedures of electing district judges for a Judicial District in the State of Louisiana that was not part of the Clark v. Roemer[1] litigation or compromise:
 (1) Cumulative Voting. By this method each voter would vote on as many judgeships as were on the ballot, with the ability to allocate to any candidate any, all, some, or none or his votes, as he chooses. For example, if there were three (3) judges to be elected in a district, then each voter would be allowed to vote three (3) times (or to be given three (3) votes) and combine, partially combine, or separate his votes so that the voter could vote all three (3) of his ballots for one candidate, or two (2) votes for one candidate and one (1) for another, or choose to cast one (1) vote for each of his preferred three (3) candidates.
 (2) Plurality Voting. By this method each voter would be allowed to cast one (1) vote only (no matter how many judgeships were on the ballot), with the judges receiving the most votes being elected. For example, if there were three (3) judges to be elected, with six (6) people running, then those three (3) who receive the most votes would be elected.
 (3) Single Member Electoral Subdistrict: Each judge would be elected from a specifically described geographical area, as would be set forth in the legislation creating and amending the judgeships from the Judicial District in question. For example, if there were three (3) judges in a judicial district, then each would run from a geographical subdistrict as set forth in the legislation, which subdistricts would have the same number of residents in each, and which may or may not require the candidates to be a resident of the subdistrict, or only a resident of the district as a whole.
You also seek an answer to the question of whether the effective date of such a legislative enactment could be deferred until the regular scheduled election for all the judges.
 I. Question No. 1
The latest opinions dealing with Voting Rights Act challenges to the conduct of judicial elections since Clark v.Roemer[2], 777 F. Supp. 471 (M.D.La. Aug. 29, 1991) include,Davis v. Chiles, 139 F.3d 1414 (11th Cir. 1998); Cousin v.Sundquist, 145 F.3d 818 (6th Cir. 1998), cert. denied, ___ S.Ct. ___, 1999 WL 80320; Milwaukee Branch of the N.A.A.C.P. v.Thompson, 116 F.3d 1194 (7th Cir. 1997), cert. denied, ___ U.S. ___, 118 S.Ct. 853, 139 L.Ed.2d 753 (1998); White v. Stateof Alabama, 74 F.3d 1058 (11th Cir. 1996); Nipper v. Smith,39 F.3d 1494 (11th Cir. 1994), cert. denied, 514 U.S. 1083,115 S.Ct. 1795, 131 L.Ed.2d 723 (1995); and League of United LatinAmer. Citizens ("LULAC") v. Clements, 999 F.2d 831 (5th Cir. 1993), cert. denied, 510 U.S. 1071, 114 S.Ct. 878,127 L.Ed.2d 74 (1994).
The court in Clark, supra, ultimately concluded that the subdistrict approach was the only remedy proposal within the court's power that would actually remedy Section 2 violations and ordered the creation of multimember election subdistricts in the districts in which Section 2 violations were found. The parties to the suit subsequently negotiated a settlement in which both the State and the plaintiffs dismissed their pending appeals of Judge Parker's decision and elections were held in 1992 in those districts where the court had found Section 2 violations, as well as an additional four districts at issue in the litigation. SinceClark, supra, courts have continued to struggle with Voting Rights Act challenges to judicial elections and proposed remedies.
LULAC, supra, is the only other 5th Circuit case addressing judicial redistricting issues, and the court therein specifically rejected single-member districting and limited and cumulative voting, relying on the state of Texas' interest in "linkage" between the electoral base and the jurisdiction. The State of Louisiana argued and presented evidence in Clark,supra, of its interest in maintaining the link between a district judge's jurisdiction and the area of residency of his or her voters. The court, however, made the following finding of fact:
 This court must conclude, on the basis of the entire record, that no such vital state interest precludes a finding of Section 2 violations [t]he court is fully aware that this record supports no such linkage argument.
Clark, 777 F. Supp. at 479.
Other circuits have dealt with these issues as follows:Davis, supra, did not find a Section 2 violation and found Florida's interest in maintaining its judicial election model and preserving linkage between its judges' jurisdictions and electoral bases outweighed proposed subdistricting remedies;Cousin, supra, viewed both single-member districting and cumulative voting as inappropriate remedies in the context of judicial elections even where a Section 2 violation has been shown; Milwaukee Branch, supra, affirmed and upheld at-large districts for judges, rejecting single-member subdistricting;White, supra reversed the imposition of a remedy increasing the size of the state appellate courts and creation of a nominating commission to appoint additional judges; and Nipper, supra,
addressed the possible remedies of single-member districting, cumulative voting, and the creation of a new Judicial Circuit, finding that plaintiffs were not entitled to relief under section 2 because none of these proposed remedies could be implemented without undermining the administration of justice.
We can not begin to judge whether a Section 2 claim could be successful in your judicial district to warrant the proposed remedies you have suggested, or whether such proposed remedies could withstand a constitutional challenge today. Nevertheless, we will do our best to inform you of the current jurisprudence in this area of law.
In order for a plaintiff to be successful in a Section 2 claim, he must first satisfy three pre-conditions, enunciated by the United States Supreme Court in Thornburg v. Gingles,478 U.S. 30, 50-51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986):
 [1] the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district [2] the minority group must be able to show that it is politically cohesive [and 3] the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.
Second, even if these factors are established, the plaintiff must show that the "totality of the circumstances" (i.e. history of past discrimination, etc.) favors a finding of a Section 2 violation.
 In summary, we hold as follows: To establish a case of liability under section 2's results test, a plaintiff must demonstrate, under the totality of the circumstances, that the voting community is driven by racial bias and that the challenged electoral scheme allows that bias to dilute the voting power of the minority group the plaintiff represents. In cases challenging the election of judges, the totality of the circumstances analysis, which was developed in the legislative election context, must be altered to take into account the characteristics unique to judicial elections. Among the factors a court must consider in conducting that analysis is the state policy advanced by the judicial election scheme at issue. Finally, a section 2 plaintiff will not be granted relief if the remedy sought would have the effect of undermining the court's ability to administer justice.
Nipper, 39 F.3d 1494, 1547. See, also Nipper,39 F.3d at 1532, where the court stated:
 In short, under Holder, federal courts may not mandate as a section 2 remedy that a state or political subdivision alter the size of its elected bodies. Implicit in this holding, however, is a broader concern. Federal courts may insist that a state or political subdivision operate a governmental structure fairly, thereby allowing all groups equal access to the political process. Courts may require, for example, that black voters are not denied the equal opportunity to elect representatives of their choice for the state legislature. Federal courts may not, however, alter the state's form of government itself when they cannot identify `a principled reason why one [alternative to the model being challenged] should be picked over another as a benchmark for comparison.' Holder v. Hall, 114 S.Ct. at 2586.
Subsequent to Thornburg, beginning with Shaw v. Reno, the Supreme Court in the 1990's recognized a cause of action under the equal protection clause to challenges to redistricting plans that used race as a factor in creating districts. In such a claim, a plaintiff must prove that race was the predominate factor for drawing the district lines, i.e. legitimate districting principles were subordinated to race. Miller v.Johnson, 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995);Bush v. Vera, 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248
(1996). If this is established, strict scrutiny applies and the question is then whether the election plan implemented is supported by a compelling state interest and is narrowly tailored to meet a compelling state interest. It would appear that a majority of the Supreme court would recognize compliance with Section 2 of the Voting Rights Act as a compelling state interest.
Since the Clark litigation, the State of Louisiana has recently defended a legislative subdistricting plan involving the Twenty-third Judicial District Court, Act 780 of the Regular Session of the 1993 Louisiana Legislature, in Jon Oren, et al.v. M.J. Foster, Jr., Governor, et al., Civil Action No. 96-3130-A, Middle District of Louisiana. In Clark, supra, Judge Parker originally held that the Twenty-third Judicial District Court was in violation of Section 2. However, the court later found that based upon insufficient election data there was insufficient evidence to support a finding of vote dilution or racial bloc voting, and reversed its earlier finding. Clark,777 F. Supp. at 460. The settlement in 1992 between the parties included the enactment of subdistricts in the Twenty-third Judicial District; thus Act 780 became law. The Oren court recently found that traditional districting criteria were not subordinated to race, that the state had very compelling reasons or interests[3] for creating the majority black subdistrict at issue, and that defendants were entitled to summary judgment as a matter of law. With regard to the Oren plaintiffs' Fifteenth Amendment argument that the creation of the majority black subdistrict effectively disenfranchises voters within and without the district because it destroys each voter's preexisting right to vote for all District Judges, the court found no merit in this argument, stating:
 First, as this court has previously found, there is no constitutional right to vote for a certain number of judges. 777 F. Supp. at 480. Second, this argument would effectively overrule Gingles, Miller, and Bush. `Redistricting to remedy found violations of § 2 of the Voting Rights Act by definition employs race.' Calhoun County, supra at p. 1408. States have the affirmative duty to remedy racial inequality in the election process. Id. That duty is limited only to the extent that the State goes beyond what is reasonably necessary to remedy the found violation. Id.
Oren, 96-3130, Cross Motions for Summary Judgment Opinion (Feb. 10, 1999) at p. 13-14. This decision has not been appealed, but the delay for appealing has not yet expired.
 Single Member Electoral Subdistrict
The Court in Clark, supra also discussed [and ultimately implemented] subdistricts as a remedy, as follows:
 Plaintiffs have proposed subdistricts in judicial districts which are drawn so as to maximize minority voting strength. Creation of such subdistricts obviously generates other problems, such as compactness, equality of population, need for future modification because of additional judgeships or population changes and the potential or perceived potential for small election districts leading to "home town" justice, to name a few.
 * * * * * *
 The court reluctantly concludes that the subdistrict approach suggested by plaintiffs, with all of its attendant problems, represents the only proposal which will actually remedy the violations of Section 2 (short of devising an entirely different system). Election subdistricts will be drawn in those judicial districts where violations have been found. State residence requirements shall be maintained in the judicial district but there shall be no residence requirement as to any election subdistrict. All other state election requirements shall be maintained.
Clark, 777 F. Supp. at 467, 468 (1990).
In drawing these subdistricts, Judge Parker adhered to the following criteria:
 (1) All subdistricts must be compact; (2) All subdistricts must be contiguous; (3) Parish and municipal boundaries should be maintained; (4) Current parish precinct lines should be followed; (5) Each subdistrict must be drawn using the existing number of judgeships; (6) Deviation in population across subdistricts must be kept to a minimum; (7) Gerrymandering to dilute minority voting strength must be avoided; (8) "Packing" or gerrymandering to concentrate minority voting strength in an attempt to achieve proportional representation must be avoided. Id.
Recently, in Cousin, supra, although the vote dilution claim failed and the court was therefore not required to address the issue of remedy, the court nevertheless expressed its view concerning the two alternative remedies proposed in the case: single-member districting, as the plaintiffs' proposed, and cumulative voting, as the district court ordered. With regard to single-member districting, the court stated:
 Even if we had held plaintiffs' vote dilution claim valid, we would not have affirmed a remedy such as they proposed in this case because it is at odds with the important state interest in `linkage.' Proper adherence to the principle of linkage ensures that a state court judge serves the entire jurisdiction from which he or she is elected, and that the entire electorate which will be subject to that judge's jurisdiction has the opportunity to hold him or her accountable at the polls. Single-member districts, as several courts have noted, eliminate the identity between the electoral and jurisdictional bases of its judges, thereby violating the state's significant linkage interest.
 * * * * * *
 In addition to such traditional concerns, the LULAC court correctly noted that maintaining linkage and shunning single-member districting actually favors minorities who may be concerned that their particular interests are not represented on the bench:
 the subdistricting remedy sought by plaintiffs provides most judges with the same opportunity to ignore minority voters' interests without fear of political reprisal they would possess if elections were in fact dominated by racial bloc voting.
 * * * * * *
 After subdistricting, a handful of judges would be elected from subdistricts with a majority of minority voters. Creating safe districts would leave all but a few subdistricts stripped of nearly all minority members. The great majority of judges would be elected entirely by white voters. Minority litigants would not necessarily have their cases assigned to one of the few judges elected by minority voters. Rather the overwhelming probability would be that the minority litigant would appear before a judge who has little direct political interest in being responsible to minority concerns.
Cousin, 145 F.3d at 827.
In Davis v. Chiles, 139 F.3d 1414, 1422-23 (11th Cir. 1998), the court held that the plaintiffs' proposed subdistricting plan was not a proper remedy for racial block voting in the affected district, the court observed:
 Today, voting in judicial elections for the Second Circuit and Leon County Courts is racially polarized, giving black candidates little hope of achieving judicial office. Whether or not we adopt Davis's plan, therefore, race would `matter' within these jurisdictions; Davis's scheme would simply exchange present misgivings about whites' successes in at-large judicial elections for new qualms from those who would view lawyers elected from Davis's new subdistricts as representatives of racial groups rather than as neutral jurists.
In Milwaukee, the 7th Circuit discussed the notion of subdistricts as follows:
 Wisconsin [defendants] believes that election of judges from subdistricts would lead to a public perception and perhaps the actuality) that judges serve the interests of constituencies defined by race or other socioeconomic conditions, rather than the interest of the whole populace. Larger jurisdictions liberate judges, to some degree, from the pressure created by the need to stand for reelection. A judge elected from a small district might fear that acquittal of a person charged with a crime against a member of that neighborhood, or a decision that harms an employer in that neighborhood, will lead to defeat at the polls. To free the judge to follow the law dispassionately, Wisconsin prefers to elect judges from larger areas, diluting the reaction to individual decisions. Perhaps the belief that judges favor those who elect them is unwarranted — though the diversity jurisdiction of the federal courts rests in part on a belief that state judges highly value the interest of that state's citizens and thus are potentially biased against citizens of other states. So too, perhaps, for smaller jurisdictions within a state. It is odd to find the United States, whose judges have secure tenure, arguing in this case that Wisconsin must treat its judiciary like ward heelers. At all events, the Voting Rights Act does not compel a state to disregard a belief that larger jurisdictions promote impartial administration of justice, if that belief is sincerely held — as the district judge concluded that it is in Wisconsin. (internal citations omitted).
116 F.3d at 1201 (1997).
 Cumulative Voting
There is no example in federal case law in which cumulative voting has been ordered and approved for elections to any office.Cousin, supra. The Cousin Court felt "[t]hat cumulative voting, is an inappropriate remedy for a Section 2 claim, and especially so when imposed on the election of state court judges" [because] "Section 2[4] of the Voting Rights Act specifically precludes its use to achieve proportional representation. * * * Yet this is precisely the effect and the strength of cumulative voting as a remedy." 145 F.3d at 829. The court went on to explain its view of why it found cumulative voting to be inappropriate in judicial elections:
 In Hamilton County, the practical effect of this remedy would require judicial colleagues who previously ran for designated positions on the Circuit, Criminal, Chancery, and General Sessions Courts, to run against each other. This result would, predictably, undermine the treasured institution of judicial collegiality, potentially complicating the disposition of administrative matters in the Eleventh Judicial Circuit and the General Sessions Court in Hamilton County. In addition, forcing these judges to oppose each other would, to a substantial degree, deny them the full appreciation of the benefits of their incumbency, increasing the potential that the election would unseat some of the hardest-working and most efficient judges in the state of Tennessee. Not only would cumulative voting undermine judicial collegiality, independence, and quality, the Eleventh Circuit has explained, but
 a cumulative voting system, like a subdistricting system, would encourage racial bloc voting. That, in turn, would necessarily fuel the notion that judges were influenced by race when administering justice.
 The only benefit black voters could legitimately expect from a court order implementing one of the appellants' proposed remedies, which would enable them to elect black judges of their choice, is the perception that the challenged circuit and county judicial systems are colorblind . . .
 By altering the current electoral schemes . . . would be proclaiming that race matters in the administration of justice. . . . Like other race-conscious remedies, this tends to entrench the very practices and stereotypes the Equal Protection Clause is set against. The case at hand, therefore, presents a remedial paradox: A remedy designed to foster a perception of fairness in the administration of justice would likely create, by the public policy statement it would make, perceptions that undermine that very ideal. In the eyes of the public and litigants, at least, justice would not remain colorblind.
 * * * * * * *
 Finally, in addition to these perception concerns, `cumulative voting raises the specter of other organized interest groups seizing control of a fraction of the state judiciary. This concern alone should caution against heralding limited and cumulative voting as panaceas for the contradictions inherent in applying section 2 to judicial elections.' We share these concerns.
Cousins, 145 F.3d at 830 (internal citations omitted).
Cumulative voting was also rejected in Nipper:
 Although cumulative voting would preserve linkage and avoid many of the concerns accompanying a subdistricting plan, such a scheme would create problems of its own. The traditional corporate cumulative voting method, or a modification thereof, would not be workable if Florida's numbered post system were maintained. Requiring judges to run for unnumbered seats on the court, meaning that all of the judges seeking reelection would be forced to oppose each other, would have a detrimental effect on the collegiality of the court's judges in administrative matters. Furthermore, requiring judges to face such opposition would dampen lawyer interest in a judicial career, thereby decreasing the pool of candidates. A lawyer contemplating a run for judicial office currently relies on the fact that he or she will not have to compete against every judge up for reelection. Moreover, the lawyer expects that, if elected, the power of incumbency (a feature of the current system) will probably ensure his or her retention in office. In addition to dampening lawyer interest in a judicial career, requiring judges to face opposition every time their terms expire would adversely affect the independence of the judiciary: Judges would begin running for reelection from the moment they took office.
 * * * * *
 Finally, a cumulative voting system, like a subdistricting system, would encourage racial bloc voting. That, in turn, would necessarily fuel the notion that judges were influenced by race when administering justice.
39 F.3d at 1546.
 Plurality Voting
In Clark v. Roemer, supra, the court discussed the remedy of plurality voting as follows:
 In an effort to avoid the problems inherent in any subdistrict scheme involving judicial elections, the Louisiana District Judges Association and the Governor propose a simple solution — plurality voting in judicial elections by division — at both district and court of appeal levels. The advantages cited by the advocates of plurality voting are many: no need to draw or redraw compact, contiguous, equal population subdistricts; it retains Louisiana's strong preference for popular election of judges; no problems are caused by adding additional judgeships; there is no concern about future violations — as minority voting strength increases in any particular district so will go the elections. Plaintiffs assert that the proposal has at least one significant disadvantage; it has not been demonstrated that plurality voting will actually provide a remedy for minority vote dilution.
 The temptation is great to embrace a seemingly simple, almost painless solution as the remedy in this case. The court has carefully considered the evidence for and against the plurality voting proposal. Ultimately, however, the court must conclude that elimination of the majority vote requirements in judicial elections will not actually remedy the Section 2 violations which have been established in this case. The court is mandated to fashion a remedy which will actually work and there is not sufficient evidence to sustain a conclusion that plurality voting will actually eliminate minority vote dilution. Dr. Weber has speculated on a number of possible scenarios in which black voters could win plurality elections. The problem with that approach is that it is, indeed, speculation. As plaintiffs have pointed out, plurality voting, by its very nature, requires more than two candidates and the overwhelming number of Louisiana judicial elections involve only two candidates. Plurality voting has every advantage except that of actually providing a remedy. For that reason the court must reject it.
 * * * * *
 This court declines to accept limited voting for several reasons First, it makes more changes in Louisiana's chosen election system than required. At present, a competent judge frequently has no opposition for his re-election and no election is held, rewarding the judge for his service and saving the cost of an election. Under limited voting, an election would be necessary unless, for example, there were four positions to be filled and only four people qualified. The majority vote requirement has already been mentioned. Second, this court finds it difficult to comprehend how we expand access to the ballot box by limiting the number of votes each elector may cast.
Clark, 777 F. Supp. at 467-468.
 II. Question No. 2
With regard to your question on the effective date of legislation, LSA-Const. Art. III, Section 19 (1974) states:
 Section 19. All laws enacted during a regular session of the legislature shall take effect on August fifteenth of the calendar year in which the regular session is held and all laws enacted during an extraordinary session of the legislature shall take effect on the sixtieth day after final adjournment of the extraordinary session in which they were enacted. All laws shall be published prior thereto in the official journal of the state as provided by law. However, any bill may specify an earlier or later effective date. (Emphasis added).
Therefore, it is our opinion that the legislature has the inherent power to provide for the effective date of a legislative enactment to be deferred until the regular scheduled election for all of the judges at issue.
We hope this opinion provides you sufficient information to have a better understanding of the issues involved herein. If we can be of further assistance, please advise.
Yours very truly,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 ___________________________________________________ ANGIE ROGERS LAPLACE Assistant Attorney General
RPI/ARL:cwr
[1] Clark v. Edwards, 725 F. Supp. 285 (M.D.La. Aug. 15, 1988), [Clark v. Roemer, 777 F. Supp. 471 (M.D.La. Aug. 29, 1991)], was a class action filed by black voters in 1986, challenging the use of multi-member districts to elect judges to family courts, district courts and courts of appeal in the State of Louisiana. The complaint alleged that the use of multi-member districts diluted black voting strength in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act [dilution-type, voting rights claim under Thornburg v. Gingles,478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25(1986)].
[2] In 1986 a class action was filed in the United States Court, Middle District of Louisiana, Janice G. Clark, et al v.Edwin W. Edwards, et al, Civil Action No. 86-435-A, which challenged the use of multi-member districts to elect judges to family courts, district courts, and courts of appeal in Louisiana.
[3] The compromise in Clark, supra cured potential Section 2 violations and ended litigation which had lasted six years. The drawing of the subdistrict in Act 780 included many factors in addition to race, including contiguity, non-splitting of precincts, the one-person, one-vote principle, protection of incumbents, political preferences of incumbents to include parts of each parish in each subdistrict and the location of Judge Turner's own political supporters. Further, compliance with Section 2 is a compelling governmental interest, even when there has been no judicial finding of a Section 2 violation, the State nevertheless has a compelling state interest when it has a "strong basis in evidence" for finding that the threshold conditions for Section 2 liability exist. Clark v. CalhounCounty, Miss., 88 F.3d 1393 (5th Cir. 1996). See, Oren, 96-3130, Cross Motions for Summary Judgment Opinion (Feb. 10, 1999).
[4] See, 42 U.S.C. § 1973(b) ("Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."), and White v. Alabama, 74 F.3d 1058, 1071-3 (11th Cir. 1996) (holding that the Voting Rights Act cannot be used as a vehicle for achieving proportional representation in Alabama's appellate courts.)